RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0192p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ROBERT J. VAN HOOK,

          *Petitioner-Appellant,*

    *v.*

CARL S. ANDERSON, Warden,

          *Respondent-Appellee.*

No. 03-4207

>

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 94-00269—George C. Smith, District Judge.

Argued: December 6, 2006

Decided and Filed: May 24, 2007

Before: BOGGS, Chief Judge; MERRITT, MARTIN, BATCHELDER, DAUGHTREY,
MOORE, COLE, CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE,
and GRIFFIN, Circuit Judges.

---

### COUNSEL

**ARGUED:** Keith A. Yeazel, Columbus, Ohio, for Appellant. Diane R. Brey, OFFICE OF THE
ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellee. **ON BRIEF:** Keith A. Yeazel,
James D. Owen, Columbus, Ohio, for Appellant. Diane R. Brey, Stephen P. Carney, Stephen E.
Maher, Charles L. Wille, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio,
for Appellee.

    McKEAGUE, J., delivered the opinion of the court, in which BOGGS, C. J.,
BATCHELDER, GIBBONS, ROGERS, SUTTON, COOK, and GRIFFIN, JJ., joined. COLE, J.
(pp. 15-22), delivered a separate dissenting opinion, in which MERRITT, MARTIN,
DAUGHTREY, MOORE, CLAY, and GILMAN, JJ., joined. MERRITT (pp. 23-25) and MARTIN
(p. 26), JJ., also delivered separate dissenting opinions, with MARTIN, DAUGHTREY, MOORE,
COLE, and CLAY, JJ., joining in Judge Merritt's dissent.

1

———————————

**OPINION**

———————————

McKEAGUE, Circuit Judge. Following the arrest of a suspect, the police advise him of his rights outlined in *Miranda v. Arizona*, 384 U.S. 436 (1966). The suspect asks for a lawyer. Under *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), all questioning must then stop (a) until a lawyer has been provided, or (b) unless the suspect "himself" initiates a discussion. Later, police talk to the suspect's mother (or a close friend, sibling, etc.), and, based on that conversation, they believe that the suspect now wants to talk with them without a lawyer. Are they permitted to approach the suspect and inquire whether he now wants to talk, based solely on the discussion with the mother? Or, rather, are they precluded from acting on that information because it was not communicated to them directly by the suspect? Today we join several of our sister circuits in holding that the police can make the limited inquiry without running afoul of *Edwards.*

**I**

Petitioner Robert Van Hook went to a Cincinnati bar patronized by male homosexuals in February 1985. He met the victim, David Self, and the two left together for Self's apartment. Once at the apartment, and after Self approached Van Hook in a sexual manner, Van Hook strangled Self to the point of unconsciousness. Using a paring knife from the kitchen, Van Hook repeatedly stabbed Self in the head and abdomen. He attempted unsuccessfully to sever the head from the body. He stabbed so violently that he created a large cavity in Self's body, exposing several internal organs. At one point, he tried to pierce Self's heart. In a final act against Self, Van Hook stuffed several items, including the paring knife, into the gaping cavity and left them there. He proceeded to take several items from Self's apartment and fled.

Van Hook eventually made his way to Ft. Lauderdale, Florida, where he was arrested two months later by local police. The police read him his *Miranda* rights. Although initially agreeing to talk, Van Hook told police, "[M]aybe I should have an attorney present." JA 5462. The officers, having understood him to be asking for a lawyer, did not further question him about the murder.[1]

Later that day, Cincinnati Police Detective William Davis came to Ft. Lauderdale to facilitate Van Hook's extradition and transportation back to Ohio. Van Hook had not yet been provided with counsel. After talking with the suspect's mother, Det. Davis believed that Van Hook might want to talk to police about the murder. On first engaging Van Hook, Det. Davis discussed the matter of extradition and confirmed that Van Hook wished to waive any objection to extradition. The detective then told Van Hook that they "had a lot to talk about," but that they "could not talk . . . unless he himself wanted to make a statement." JA 3789. "[A]t that point, [Van Hook] indicated he had talked to his mother, and that she had told him just to tell the truth, and he wanted to make a statement." *Id.* After having his *Miranda* rights read to him again, and waiving them, Van Hook gave a full and graphic confession.

A grand jury returned an indictment charging Van Hook with aggravated murder and aggravated robbery. Prior to trial, defense counsel moved to suppress the confession. Finding that Van Hook had invoked his right to have counsel present but then had reinitiated discussions with

———————————

[1] In 1985, the officers did not have the benefit of the Supreme Court's decision in *Davis v. United States*, 512 U.S. 452 (1994), when the Court made clear that a suspect in custody must "unambiguously request counsel," *id.* at 458, and that "maybe I should talk to a lawyer" is not an unequivocal request, *id.* at 462. In 2007, Van Hook's statement might well not have sufficed to require that questioning be stopped. The officers did, however, understand Van Hook to have asked for a lawyer, and stopped any further questioning of him based on his statement.

police, the Ohio trial court admitted the confession. At trial, Van Hook never denied killing Self, but instead claimed temporary insanity. A three-judge panel rejected his defense, convicted him of aggravated murder with a death specification and aggravated robbery and sentenced him to death.

After being denied any relief in the state courts on direct appeal, *see State v. Van Hook*, 530 N.E.2d 883 (Ohio 1988), *cert. denied*, 489 U.S. 1100 (1989), and on collateral review, Van Hook sought a writ of habeas corpus in federal district court. He raised multiple claims of error. The district court denied the petition on all claims. On appeal, a panel of this court reversed the district court's judgment on Van Hook's Fifth Amendment claim, concluding, as a matter of law, that a suspect could not initiate discussions with police through a third party; rather, the suspect, and only the suspect "himself," could "initiate the conversation." *Van Hook v. Anderson*, 444 F.3d 830, 836 (6th Cir. 2006) (vacated). The panel declined to address the factual question of what Van Hook's mother said to Det. Davis that led him to believe Van Hook might want to talk with him. *Id.* It further declined to reach Van Hook's remaining claims for relief. On the warden's petition, the court decided to vacate the panel's opinion and hear the appeal *en banc*.

## II

Van Hook sought habeas relief more than a year before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (the "AEDPA"). Thus, we review his petition under pre-AEDPA habeas law. *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). A "high measure of deference" is owed to the factual findings of state courts. *Sumner v. Mata*, 455 U.S. 591, 598 (1982) (citing the pre-AEDPA version of 28 U.S.C. § 2254(d)); *see also Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999) (explaining that state court findings of fact are presumed correct unless rebutted by clear and convincing evidence); *Lundy v. Campbell*, 888 F.2d 467, 469 (6th Cir. 1989) (noting that federal courts must give "complete deference to evidence-supported state court findings of fact"). On the other hand, we review questions of law, as well as mixed questions of law and fact, *de novo*. *Mapes*, 171 F.3d at 413. Whether a suspect clearly and unequivocally asked for counsel, and whether the suspect initiated discussions with police after asking for counsel, are ultimately legal questions. *United States v. Whaley*, 13 F.3d 963, 966, 968 (6th Cir. 1994). The underlying questions of "what happened"—i.e., "basic, primary, or historical facts"—are, however, findings of fact that are presumed correct unless rebutted with clear and convincing evidence. *Thompson v. Keohane*, 516 U.S. 99, 110-13 (1995); *cf. Whaley*, 13 F.3d at 968 ("While we accept, unless clearly erroneous, the facts that the district court found, whether those facts together constitute an 'initiation' under *Edwards* is a legal question we review *de novo*.").

## III

### A

Van Hook contends that his confession to the murder of David Self should have been suppressed under *Edwards*. As guaranteed by the Fifth Amendment to the federal Constitution, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Of course, "[f]reedom of choice is not a stranger to the constitutional design of procedural protections for a defendant in a criminal proceeding." *Faretta v. California*, 422 U.S. 806, 834 n.45 (1975). A criminal suspect is free to offer a confession to authorities, subject to special procedural protections.

"[T]he Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment" require "that a confession be voluntary to be admitted into evidence." *Dickerson v. United States*, 530 U.S. 428, 433 (2000) (citations omitted). "[T]he advent of modern custodial police interrogation brought with it an increased concern about confessions obtained by

coercion." *Id.* at 434-35 (citation omitted).  To address this concern, the Supreme Court "laid down concrete constitutional guidelines for law enforcement agencies and courts to follow," *id.* at 435 (internal quotation marks omitted), including the procedures announced in *Miranda* and extended in *Edwards*.

The rule of *Edwards*—a suspect who is in custody and has asked for a lawyer must not be subject to further interrogation[2] until a lawyer has been provided or unless the suspect initiates a discussion—is "a corollary to *Miranda*'s admonition that if the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Arizona v. Roberson*, 486 U.S. 675, 680 (1988) (internal quotation marks and brackets omitted).  It "is designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Davis*, 512 U.S. at 458 (internal quotation marks omitted).  "In the absence of such a bright-line prohibition, the authorities through 'badgering' or 'overreaching'—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself." *Smith v. Illinois*, 469 U.S. 91, 98 (1984) (internal quotation marks and brackets omitted); *see also North Carolina v. Butler*, 441 U.S. 370, 374 (1979) ("Without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.").  Moreover, the rule provides "clear and unequivocal guidelines to the law enforcement profession," *Roberson*, 486 U.S. at 682, and "conserves judicial resources which would otherwise be expended in making difficult determinations of voluntariness," *Minnick v. Mississippi*, 498 U.S. 146, 151 (1990).

**B**

The rule of *Edwards* embodies two independent inquiries:

> First, courts must determine whether the accused actually invoked his right to counsel. . . . Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.

*Smith*, 469 U.S. at 95 (citations omitted).  On the first inquiry, we agree with the district court and find no error in the conclusion of the Ohio courts that Van Hook asked for the presence of a lawyer, especially in light of the police officers' statements that they understood him to have asked for a lawyer, and their cessation of any further questioning. *See Abela v. Martin*, 380 F.3d 915, 926 (6th Cir. 2004) (explaining that courts can consider the "surrounding circumstances" of a request, including the response of the officers, to "confirm that a reasonable officer would understand [the suspect's] statement to be a clear request for counsel").  As to the latter part of the second inquiry, whether Van Hook's waiver of his rights and confession in response to questioning were knowing and intelligent, the district court concluded that they were under the totality of the circumstances.  On appeal, Van Hook has not contested the district court's ruling in this regard.[3]  He has, therefore, waived the right to challenge this holding. Fed. R. App. P. 28; *Dixon v. Ashcroft*, 392 F.3d 212, 217

---

[2] An interrogation is defined as an exchange between police and a suspect in custody "reasonably likely to evoke an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 n.7 (1980).

[3] *See, e.g.*, Appellant's Final Brief at 39 ("The discrete issue is whether Van Hook actually initiated contact with CPD Officers through the use of a non-attorney third-party agent, his mother, prior to his confession, in conformance with the constitutional rules enunciated in *Edwards v. Arizona*.").  Nowhere in his final brief, reply brief, or supplemental brief does Van Hook argue that his waiver of the rights to silence and to counsel was not knowing or intelligent under the totality of the circumstances.

(6th Cir. 2004). It follows that Van Hook's waiver of his rights to silence and to counsel has been finally determined to have been knowing and intelligent. That question is not before us on appeal. Thus, we are left to consider the gravamen of Van Hook's *Edwards* claim: whether he initiated further discussions with the police.

It is undisputed by the parties, and confirmed by the record, that Van Hook did not directly approach the police to discuss the murder. "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 U.S. at 484. If a discussion comes at the behest of the police after the right to counsel has been invoked, it is presumed coercive. *Roberson*, 486 U.S. at 685-86. If all the record showed was Det. Davis—unprompted—initiated the discussion, the confession would likely have to be suppressed. *Edwards*, 451 U.S. at 484-85; *Whaley*, 13 F.3d at 967.

The record, however, shows more.

## C

The facts in this case require us to resolve first the legal question whether a suspect can initiate discussions with police through a third party. The petitioner argues, under a plain reading of *Edwards*, that only the suspect "himself" can communicate a willingness and a desire to talk with the police (i.e., from the suspect's lips to the police's ears). We disagree.

There is no sound justification for reading the statement from *Edwards* that the suspect "himself" must initiate a discussion to imply the suspect, and only the suspect, can inform the police he wants to talk. The Supreme Court did not command in *Edwards* that a suspect must directly inform the police he wants to talk, as opposed to informing them through a third party. The propriety of communication through a third party was not before the Court in *Edwards*, nor has the Court taken up the issue since that decision. "Constitutional rights are not defined by inferences from opinions which did not address the question at issue." *Texas v. Cobb*, 532 U.S. 162, 169 (2001).

While *Edwards* set out the general rule, the Court has, when faced with circumstances not addressed in that original decision, both extended the rule, *see, e.g.*, *Roberson*, 486 U.S. at 687-88 (concluding that *Edwards* applies when a police-initiated interrogation following a suspect's request for counsel occurs in the context of a separate investigation), and restricted it, *see, e.g.*, *Davis*, 512 U.S. at 459-60 (concluding that *Edwards* does not apply when a suspect fails to unambiguously ask for a lawyer). As the Court explained in *Dickerson*, such refinement in the face of new circumstances is entirely appropriate: "No court laying down a general rule can possibly foresee the various circumstances in which counsel will seek to apply it, and the sort of modifications represented by [cases extending and restricting *Miranda*] are as much a normal part of constitutional law as the original decision." 530 U.S. at 441.[4]

---

[4] The Supreme Court held in *Dickerson* that *Miranda* announced a "constitutional rule that Congress may not supersede legislatively." 530 U.S. at 444. Since that decision, there has been considerable disagreement over whether the Court intended to repudiate its earlier descriptions of *Miranda* as a "prophylactic rule" by adopting the "constitutional rule" description, or whether, instead, the two concepts are reconcilable. *Compare United States v. Patane*, 542 U.S. 630, 636 (2004) ("[T]he *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause.") (Thomas, J., announcing the judgment of the Court and an opinion joined by Chief Justice Rehnquist and Justice Scalia), *Chavez v. Martinez*, 538 U.S. 760, 770 (2003) ("In the Fifth Amendment context, we have created prophylactic rules designed to safeguard the core constitutional right protected by the Self-Incrimination Clause.") (Thomas, J., announcing the judgment of the Court and an opinion joined by Chief Justice Rehnquist and Justices O'Connor and Scalia), *and Hannon v. Sanner*, 441 F.3d 635, 637 (8th Cir. 2006) ("The Court defined *Miranda* as a 'constitutional decision' announcing a 'constitutional rule,' but never described the *Miranda* safeguards as a

In determining how the general rule of *Edwards* applies to third-party communications, we begin with our standard for determining when a suspect initiates a discussion. In *Whaley*, this court held, "[A]n *Edwards* initiation occurs when, without influence by the authorities, the suspect shows a willingness and a desire to talk generally about his case." 13 F.3d at 967 (reconciling the plurality and dissenting opinions in *Oregon v. Bradshaw*, 462 U.S. 1039 (1983)). There is nothing inherent in "show[ing] a willingness and a desire" that restricts it to direct communication only. To show something means to manifest, demonstrate, or communicate something. One way to show or demonstrate something is by person-to-person communication. Another way is by person-to-person-to-person communication. While the latter indirect communication may give rise to a question about the accuracy of the received message, any such question is alleviated when the ultimate recipient can ask the original declarant whether the received message is accurate. Thus, a suspect could, consistent with *Whaley*, communicate a willingness and a desire to talk with police through a third person. Whether the communication is direct or indirect is immaterial—what is important is the impetus for discussion comes from the suspect himself.[5]

We next consider how other courts have treated third-party communications. Van Hook has pointed to no decision where a court has concluded that a suspect cannot, as a matter of law, initiate a discussion with police through a third party. In fact, the decisions addressing this issue, while few in number, all support the validity of third-party communications. In *Owens v. Bowersox*, the police had arrested the defendant for murder and counsel had been appointed. 290 F.3d 960, 962 (8th Cir.), *cert. denied*, 537 U.S. 1035 (2002). After his arraignment, a police detective picked up the defendant's mother and brought her to the police station. *Id.* During the drive, the mother told the detective that she talked to her son on the phone and persuaded him to tell the police the truth. *Id.* Once at the station, the detective told the defendant that he had been informed by the defendant's mother that he wanted to talk to police. *Id.* The defendant confirmed that the information was correct. *Id.* Before questioning, the detective read the *Miranda* rights to the defendant a second time. *Id.* The defendant confessed and was convicted of first-degree murder. *Id.* at 961.

On appeal, the Eighth Circuit considered whether the defendant's confession was obtained in violation of his Sixth Amendment right to counsel.[6] The state court had earlier found that the defendant did not contact the police himself nor did he ask his mother to have the police contact him. Nevertheless, the state court concluded that the initiation came from the defendant through his

_____

'constitutional right' equivalent to the Fifth Amendment itself. We thus view *Dickerson* as maintaining the *status quo* of the *Miranda* doctrine . . . ."), *with Chavez*, 538 U.S. at 788 n.3 (Stevens, J., dissenting) (arguing that "the Court disavowed the 'prophylactic' characterization of *Miranda*" in *Dickerson*), *Burgess v. Dretke*, 350 F.3d 461, 468-69 (5th Cir. 2003) ("In *Dickerson v. United States*, the Supreme Court changed its approach to *Miranda* and held that *Miranda* is a 'constitutional decision' rather than a mere 'prophylactic' requirement."), *and United States v. Talley*, 275 F.3d 560, 564 (6th Cir. 2001) (describing the *Dickerson* decision as holding "that the right to a *Miranda* warning is constitutionally based, rather than 'prophylactic'").

We decline to wade into the turbulent waters surrounding whether *Edwards* is also a "constitutional rule" and, if so, whether the Supreme Court's descriptions of the rule as a prophylactic should be jettisoned. *See, e.g.*, *Cobb*, 532 U.S. at 175 (post-*Dickerson* description of *Edwards* as a "preventative rule") (Kennedy, J., concurring). As explained in *Dickerson*, even constitutional rules announced by the Court are subject to subsequent refinement.

[5]Van Hook argues his interrogation was unconstitutional under *Whaley*. The facts of that case are, however, distinguishable. In *Whaley*, after the defendant arguably initiated a discussion with an ATF agent, "nothing happened for three weeks." 13 F.3d at 968. The court found that given the defendant "did nothing else during the succeeding three-week period, his actions certainly do not show a willingness and a desire to speak generally about his case." *Id.* In other words, the defendant's communication which arguably showed a willingness and a desire to talk had grown stale by the time the police acted on it. In the present case, it is undisputed Van Hook met with Cincinnati police the same day he was arrested—the same day he talked to his mother and decided to talk with police. *Infra* § III.E.

[6]In *Michigan v. Jackson*, the Supreme Court applied *Edwards* to the Sixth-Amendment context. 475 U.S. 625, 636 (1986).

mother.  The Eighth Circuit agreed there was no constitutional violation:

> Although the state's position undoubtedly would be stronger if [the defendant] himself had contacted the police, we do not believe that it was unreasonable for the state court to hold that a defendant may "evince" a willingness and desire to discuss the crime by communicating with the police through a third party, especially a close relative. *See Holman* [*v. Kemna*], 212 F.3d [413,] 416, 419-20 [(8th Cir. 2000)] (defendant initiated contact with police by asking stepfather to have deputy come to prison to take his confession).  Nor do we believe that relief under § 2254 may be granted to [the defendant] based on his failure to ask his mother specifically to send a police officer to the jail.  Presuming, as the state court found, that [the defendant] told his mother that he wanted or was willing to talk to the police, we conclude that the state court's determination that Mr. Owens was the impetus behind the contact and thereby "initiated" the interrogation was not objectively unreasonable.

*Id*. at 963-64.  The court denied the defendant's petition for habeas relief.

Other courts have also addressed the issue and likewise concluded a third party may communicate a suspect's desire to initiate a discussion. *See, e.g.*, *United States v. Michaud*, 268 F.3d 728, 737-38 (9th Cir. 2001) (on direct appeal, finding that officers had the right to inquire whether a suspect was reinitiating communication when her cell-mate told a deputy she wanted to talk), *cert. denied*, 537 U.S. 867 (2002); *United States v. Gonzalez*, 183 F.3d 1315, 1323-24 (11th Cir. 1999) (on direct appeal, holding that the suspect initiated discussions with police through his wife), *cert. denied*, 528 U.S. 1144 (2000), *overruled on other grounds*, *United States v. Diaz*, 248 F.3d 1065 (11th Cir. 2001); *United States v. Gaddy*, 894 F.2d 1307, 1310-11 (11th Cir. 1990) (on direct appeal, holding that the suspect initiated discussions with police through his aunt).  The Georgia Supreme Court faced an analogous situation in *Harvell v. State*, 562 S.E.2d 180 (Ga.), *cert. denied*, 537 U.S. 1052 (2002).  In that case, the defendant's mother told a police officer that her son was willing to make a statement. *Id.* at 182.  The officer asked the defendant if this was true, and the defendant confirmed that it was. *Id.*  The defendant was later convicted based on statements he made during the subsequent questioning. *Id.*  On appeal, the Georgia Supreme Court held that the officer did not improperly reinitiate questioning and affirmed the conviction. *Id.* at 182-83.

In the instant case, a majority of the Ohio Supreme Court held that a suspect can initiate a discussion with police indirectly through a third party. *Van Hook*, 530 N.E.2d at 884, 887-88.  Tellingly, even the dissenting Justices noted, "[T]here seems to be no reason why a defendant in custody could not initiate contact with the police through a third party." *Id.* at 894 (Wright, J., joined by Brown, J., dissenting).  They dissented, rather, based on what they deemed an insufficient factual record. *Id.*

As these decisions illustrate, permitting a suspect to communicate a willingness and a desire to talk through a third party is consistent with the interest protected by *Edwards*.  "[T]he purpose behind . . . *Miranda* and *Edwards*" is to "prevent[] government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Arizona v. Mauro*, 481 U.S. 520, 529-30 (1987).  It is the possibility of "badgering" and "overreaching" by police—i.e., government coercion—that *Edwards* is designed to guard against. *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) ("The sole concern of the Fifth Amendment . . . is *governmental* coercion." (emphasis added)); *see also Illinois v. Perkins*, 496 U.S. 292, 297 (1990) ("[T]he danger of coercion results from the interaction of custody and official interrogation."); *Michigan v. Harvey*, 494 U.S. 344, 353 (1990) ("Both *Jackson* and *Edwards* establish prophylactic rules that render some otherwise valid waivers of constitutional rights invalid when they result from *police-initiated* interrogation." (emphasis added)); *Jackson*, 475 U.S. at 636 ("We thus hold that, if police initiate interrogation after a defendant's assertion, at an arraignment

or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid."). This court explicitly stated this in *Whaley*: "[T]he whole point of *Edwards* is to prevent *officials* from badgering defendants into waiving their asserted right to counsel through repeated questioning." 13 F.3d at 968 (emphasis added).

If we were to prohibit a suspect from initiating a discussion with the police through a third-party, we would be crafting an artificial rule not required by the Constitution, as well as imposing an undue burden on our criminal-justice system. As the Supreme Court has recognized, "[T]he Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources *other than* official coercion." *Connelly*, 479 U.S. at 170 (emphasis added, internal quotation marks omitted); *see also Perkins*, 496 U.S. at 296-97 ("There is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess."). Suspects have no constitutional protection against friends or family members who convince them to talk with police. *Mauro*, 481 U.S. at 528 ("We doubt that a suspect, told by officers that his wife will be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way."); *Snethen v. Nix*, 885 F.2d 456, 457-60 (8th Cir. 1989) (finding no interrogation when a suspect's mother gained access to him by telling officers "if [my son] did this, he will tell me," and exhorted her son to confess so her other son would not be unjustly punished); *Plazinich v. Lynaugh*, 843 F.2d 836, 838-39 (5th Cir. 1988) (rejecting "an interpretation of *Edwards*' prophylactic rule that is divorced from the context of badgering police conduct from which the rule sprang"). The Constitution clearly forbids officials from using their "power of the sword" to coerce a suspect into making self-incriminating statements; it provides no similar protection against third-party cajoling, pleading, or threatening.

Moreover, as the Court has also recognized, "[T]he Constitution does not negate society's interest in the ability of police to talk to witnesses and suspects." *Cobb*, 532 U.S. at 171-72. Both the majority and the dissent in *Minnick* noted the importance of admissions of guilt in our criminal-justice system: "Both waiver of rights and admission of guilt are consistent with the affirmation of individual responsibility that is a principle of the criminal justice system." 498 U.S. at 155 (Kennedy, J., writing for the majority); "Admissions of guilt . . . are more than merely desirable; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Id.* at 161 (Scalia, J., dissenting) (internal quotation marks omitted). The goal of our criminal-justice system—bringing criminals to justice—and the role of police-suspect discussions in meeting this goal are important considerations in deciding how to apply the general rule of *Edwards*. Courts must not create "'wholly irrational obstacles to legitimate police investigative activity.'" *Davis*, 512 U.S. at 460 (quoting *Michigan v. Mosley*, 423 U.S. 96, 102 (1975)). *Cf. Moran v. Burbine*, 475 U.S. 412, 424 (1986) ("Because the proposed modification [by the defendant] ignores the underlying purposes of the *Miranda* rules and because we think that the decision as written strikes the proper balance between society's legitimate law enforcement interests and the protection of the defendant's Fifth Amendment rights, we decline the invitation to further extend *Miranda*'s reach.").

As for the benefits of a "'relatively rigid'" rule, *Roberson*, 486 U.S. at 681 (quoting *Fare v. Michael C.*, 442 U.S. 707, 718 (1979)), recognizing initiation of discussions through third-party communications does not unduly dilute those benefits. All parties involved benefit to some extent from *Miranda* (and its corollary, *Edwards*):

> [It] has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible. This gain in specificity, which benefits the accused and the State alike, has been thought to outweigh the burdens that the decision in *Miranda* imposes on law

enforcement agencies and the courts by requiring the suppression of trustworthy and highly probative evidence even though the confession might be voluntary under traditional Fifth Amendment analysis.

*Minnick*, 498 U.S. at 151 (quoting *Fare*, 442 U.S. at 718); *see also Roberson*, 486 U.S. at 681 (emphasizing the virtues of a bright-line rule); *Smith*, 469 U.S. at 94-95 (same). With third-party communications, the police are still prohibited from reinitiating questioning, and the impetus for reinitiation must still come from the suspect. The virtue of specifically identifying rights and duties is preserved: "police and prosecutors" still know "what they may do in conducting custodial interrogation" under *Edwards*—interrogate a suspect unless and until the suspect asks for a lawyer, and then not interrogate the suspect unless the suspect initiates a discussion (and waives the right to counsel); and "courts" still know "under what circumstances statements obtained during such interrogation are not admissible"—when the discussions are initiated by police. These players must simply bear in mind what is grasped by common sense and what has been the consistent rule of the post-*Edwards* case law—initiation can be communicated directly by the suspect or indirectly by the suspect through a third party.

Although determining whether a suspect in fact initiated a discussion through a third party uses more judicial resources than a rule strictly forbidding such communications, the impact is minimal. As the paucity of cases addressing this issue suggests, *see supra*, this circumstance is the exception, not the norm. Moreover, if any institution has the specialized expertise to resolve, efficiently and effectively, this type of factual question, it is a trial court.[7]

One might ask why third-party communications should be permitted when a suspect could just communicate directly with the police. But that is the wrong question.[8] Rather, one should ask, why not? Initiation of a discussion through a third party does not contravene *Edwards* or its progeny. It is consistent with the purpose of *Edwards*—to protect against government coercion—as well as with our standard for determining whether a suspect has initiated a discussion. It furthers the interest in permitting suspects to talk with the police and advances the investigation for truth. It does not erode a suspect's protection against official coercion because the police must confirm whether the third-party communication is accurate before beginning any discussion or questioning. For these reasons, we conclude that a suspect can initiate a discussion with police through the communication of a third party.

## D

Before reaching the question of whether Van Hook did, in fact, initiate a discussion, we briefly address a few of the arguments made in the dissenting opinions on the purely legal question of initiation under *Edwards*. In his dissenting opinion, Judge Cole argues that we ignore a "logical

---

[7] Judge Cole principally relies on the advantages of "bright," "rigid" lines to justify a rule prohibiting communication through a third party. *See* Judge Cole's Dis. Op. at 16-17, 19-20. We whole-heartedly agree that bright, rigid lines in the law further many laudable interests. Yet, in creating the rule of *Edwards*, the Supreme Court could not expect that application of the rule would always and forever be mechanical and void of judgment. The Supreme Court, this circuit, and other courts have recognized whether a suspect has initiated a discussion can, in some instances, be a close call. *See, e.g.*, *Bradshaw*, 462 U.S. at 1045-46 (describing the suspect's question as "ambiguous"); *Whaley*, 13 F.3d at 966 (acknowledging some initiations will "present . . . difficult question[s]"). When drawing a bright line, a court cannot hope to eliminate each and every close call, but rather only to minimize them.

[8] It is the wrong question because the Fifth Amendment right against self-incrimination, the Due Process Clause of the Fourteenth Amendment, and the *Edwards* rule are not principally requirements foisted upon individuals, but rather restrictions imposed upon federal, state and local governments. The danger lies in government coercion, not a suspect's free choice. This distinction leads to a clear answer to the question—if a suspect chooses to "exercis[e] his free will," *Harvey*, 494 U.S. at 353, by communicating through a third party, courts have no business negating that communication.

flaw" in the proposition that any suspect would actually communicate indirectly what could be communicated directly. Judge Cole's Dis. Op. at 16. According to the dissent, the suspect "does a strange thing" if he tells someone like his mother that he wants to talk, rather than telling "the police" directly. *Id.* There is, however, nothing illogical or strange about it.

First, as we noted earlier, the issue of initiation through a third party has been addressed by courts in the past. Thus, strictly speaking, there is no logical, *a priori* flaw in recognizing that a suspect might choose to initiate through a third person—it has happened before.[9]

Furthermore, suggesting that it would be strange for a suspect to choose to initiate through a third party ignores the realities of many (if not most) detention centers. "The police" is not a monolith. Detectives and investigating officers do not typically act as guards roaming all day the areas directly adjacent to holding cells. If a suspect wants to initiate a discussion with an investigating officer, the suspect will frequently have to tell someone other than that officer. Of course, the suspect could just tell the nearest guard, who could then pass along the message to the investigating officer.

Yet, when a suspect talks with a guard or some other non-investigative member of the police and that person believes that the suspect wants to waive his right to counsel and so informs the investigating officer, the officer can be faced with similar "'lost in translation' problems" as those identified by the dissent. Judge Cole's Dis. Op. at 18. For example, what if a suspect "speculate[s]" in front of a guard "about whether making a statement would ameliorate his situation"? *Id.* What if the guard then tells the officer this? Might not the officer want "to verify that a conversation between the suspect" and the guard "actually occurred"? *Id.* at 20. Might not the officer want to "prob[e]" the guard "about exactly what the suspect said" before launching into an interrogation? *Id.* Isn't there a danger a guard could "misinterpret[]" or in fact "ignore[]" what the suspect said or intended? *Id.* at 19. Restricting a suspect's freedom to communicate through a third party would not eliminate the practical risk of translation problems, regardless of the guard's role as part of "the police."

This leads to a further flaw in the dissent's reasoning. Is it really irrational to believe a suspect could decide to ask his mother (or some other third party) to tell the investigating officer that he wants to talk, rather than telling the nearest guard? From the suspect's perspective, who more likely has his best interests in mind—his mother or the guard? From the suspect's perspective, who more likely does he trust—his mother or the guard? From the suspect's perspective, who is more likely to keep his desire to talk secret from another co-suspect in the next jail cell—his mother or the guard? There are a host of reasons why a suspect could rationally choose to initiate through a third party rather than with a guard. In the end, the pertinent question is not *why* a suspect would ask a third party rather than a guard to contact the investigating officer, but *whether* the suspect did so.

Next, it is asserted by the dissent that we create a "glaring asymmetry" with our decision today. *Id.* at 20. The asymmetry purportedly stems from a comparison of the right to invoke counsel, which cannot be made by a third person on behalf of a suspect, with our holding that a suspect can use a third party to initiate a discussion with the police. The existence of an asymmetry, however, is illusory—only by conflating initiation and waiver can one be imagined.

As we have explained, *supra* § III.B, there exist multiple steps to a valid waiver of the right to counsel, not just a showing of initiation by the suspect under *Edwards*. *United States v. Ware*, 338

---

[9]Of course, from an empirical standpoint, courts may come across this circumstance only infrequently. This could explain the small number of decisions addressing the issue and could also belie the apocalyptic assertion that we are "eviscerating *Edwards*" today. *Cf. Oregon v. Elstad*, 470 U.S. 298, 318 n.5 (1985).

F.3d 476, 481 (6th Cir. 2003) ("Although [the suspect] initiated the conversation, it is still necessary to determine whether he validly waived his rights to counsel and to remain silent."); *see also Bradshaw*, 462 U.S. at 1044-46 (plurality) ("But even if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation."), 1054 n.2 (dissent) ("If an accused has himself initiated further communication with the police, it is still necessary to establish as a separate matter the existence of a knowing and intelligent waiver . . . .."); *Wernert v. Arn*, 819 F.2d 613, 615 (6th Cir. 1987).[10]  The symmetrical opposite of *invoking* the right to counsel, Judge Cole's Dis. Op. at 20, is not initiating a discussion but rather *waiving* the right to counsel.

While a suspect's initiation might lead to a valid waiver of the right to counsel, it is not itself sufficient.  Before the police can actually begin to interrogate a suspect after he has initiated, they must ensure that the suspect is knowingly and intelligently waiving the right to counsel under the totality of the circumstances. *See supra* § III.B.  It is "wrong" to "think[] that an 'initiation' of a conversation or discussion by an accused not only satisfied the *Edwards* rule, but *ex proprio vigore* sufficed to show a waiver of the previously asserted right to counsel.  The inquiries are separate, and clarity of application is not gained by melding them together." *Bradshaw*, 462 U.S. at 1045 (plurality).  Simply put, nothing in our decision today permits the police to begin interrogating a criminal suspect simply by learning from a third party that the suspect is willing to waive the previously invoked right to counsel.  Nor do we hold that a third party has the authority to somehow "bring[] about the waiver of that right," Judge Cole's Dis. Op. at 20, or otherwise "rescind[] th[e] request" for counsel, *id.* at 21.  When the police receive information that a suspect wants to talk; when there is a sufficient basis for believing its validity; and when the police confirm with the suspect the validity of that information, we conclude that the suspect has adequately evinced a willingness and a desire to talk with them.  Whether the suspect knowingly and intelligently waives his right to counsel is a separate question—a question, it bears repeating, we are not asked to answer today.[11]

Finally, we are urged today to devise a special set of rules governing initiation by a suspect through a third party.  We decline the invitation.  First, and most importantly, our judicial role is to rule on the case before us, not a hypothetical one that could come before us in the future.  Furthermore, as the plurality in *Bradshaw* recognized, there is little wisdom in "build[ing] a superstructure of legal refinements around the word 'initiate.'" *Bradshaw*, 462 U.S. at 1045.  Caution is especially apt where, as here, we have little from the text of the Constitution from which to draw such a set of rules.  We leave to another day any further refinement of our holding which may be necessitated by a different set of facts than those presented here.

---

[10]This is clear when, as here, the subsequent discussion between the suspect and the police is not "wholly one-sided." *Edwards*, 451 U.S. at 486 n.9.  In the rare event when a suspect does offer the police an unprompted, monologue confession, there is no *Edwards* problem because "[a]bsent . . . interrogation, there would have been no infringement of the right that [the suspect] invoked and there would be no occasion to determine whether there had been a valid waiver." *Id.* at 486.

[11]Nor does our holding today ask "too much" of law enforcement. Judge Cole's Dis. Op. at 20.  Determining whether a suspect has knowingly and intelligently waived the rights to counsel and to remain silent under the totality of the circumstances can present questions much more daunting than those necessary in assessing the likely validity of a suspect's message from a third party.  For example, what words must a suspect use to show that he is aware of the consequences of relinquishing his rights? What words must a suspect use to show that he is aware of the nature of the rights he is relinquishing?  Is there a basis to believe the suspect does not understand his rights?

**E**

Having concluded that a suspect can initiate a discussion with police through the communication of a third party, we must take up the question whether Van Hook actually initiated a discussion with police through his mother. "Whether a suspect has [initiated a discussion] . . . can occasionally present a difficult question." *Whaley*, 13 F.3d at 966. In answering this question, we remain mindful of our limited role as a federal court reviewing the factual findings of a state trial or appellate court. *See* 28 U.S.C. § 2254(d) (pre-AEDPA); *Sumner*, 455 U.S. at 598; *Mapes*, 171 F.3d at 413; *Lundy*, 888 F.2d at 469. Although the prosecution had the burden of proof to show initiation at the suppression hearing, we presume on habeas review that the factual findings of the state courts are correct, and can set those findings aside only if the petitioner meets one of the eight conditions spelled out in 28 U.S.C. § 2254(d)(1)-(8) (pre-AEDPA). Specifically, subsection (8) states such findings are presumed correct unless they are "not fairly supported by the record" "as a whole." Moreover, when two different "conclusions find fair support in the record," a federal court may not "substitut[e] its view of the facts for that of the [state] [c]ourt." *Wainwright v. Goode*, 464 U.S. 78, 85 (1983); *see also Patton v. Yount*, 467 U.S. 1025, 1040 (1984) (explaining that even when "the cold record arouses some concern," a federal court may not overturn the factual findings of a state court on habeas review).

Although the record is voluminous, the key parts of the record for our purpose are Van Hook's taped statement and the suppression hearing testimony of Det. Davis. Review of these confirms the following: Van Hook talked with his mother after his request for a lawyer but before he met with Det. Davis, JA 5209 (from Van Hook's statement); she told him to cooperate and tell the truth, *id.* (from Van Hook's statement); he decided to talk with police based on the talk with his mother, JA 5208-09 (from Van Hook's statement); Det. Davis spoke with Van Hook's mother before traveling to Florida, JA 3790 (from Det. Davis's testimony); she told him that she had spoken with her son, *id.* (from Det. Davis's testimony); based on that discussion, Det. Davis thought that Van Hook might want to talk to him, *id.* (from Det. Davis's testimony); Det. Davis told Van Hook that he had talked with his mother, JA 3783 (from Det. Davis's testimony); Van Hook confirmed to Det. Davis that he had talked with his mother and wanted to make a statement, *id.* (from Det. Davis's testimony); Det. Davis read Van Hook his *Miranda* rights, JA 5207-08 (from Van Hook's statement); Van Hook stated that he wanted to waive these rights, *id.* (from Van Hook's statement); and Van Hook confirmed to Det. Davis that he changed his mind after talking with his mother, JA 5209 (from Van Hook's statement). Van Hook raises no claim of error as to these matters.

He does, however, take issue with two related findings of the Ohio Supreme Court, namely (1) that Det. Davis spoke with Van Hook's mother *after* her son was arrested and asked for counsel, and (2) that she specifically informed Det. Davis that her son wanted to talk with him. On these two issues, the state court concluded:

> As previously indicated, Detective Davis's belief that appellant would want to talk to him occurred *after* and *because* of what appellant's mother had said to him. In the context of this conversation, both appellant and Detective Davis predicated their conversation upon what had been spoken with appellant's mother. It is most clear that appellant had agreed to act upon his mother's advice "to tell the truth" and thus to "make a statement." Obviously, this was the subject of appellant's conversation with his mother, and he communicated his agreement to do so to her. That this had been communicated to Detective Davis is quite apparent from the context in which the detective utilized the fact of his conversation with appellant's mother, i.e., as a basis for inquiring whether appellant indeed wished to make a statement. It would have had little meaning, particularly in light of appellant's response, unless both men understood that appellant's desire to make a voluntary statement had been communicated to Detective Davis through appellant's mother. . . . Our conclusion

is further strengthened by the clarity with which appellant expressed his resolve to speak with police and his explanation that it was based upon discussions which he initiated with his mother. Furthermore, the decision to speak apparently had been reached earlier in the day, and thus well before he met with Detective Davis.

*Van Hook*, 530 N.E.2d at 887-88 (emphasis added).

We find no basis in the record to disturb these findings. Van Hook is correct that there is no direct evidence of when precisely Det. Davis spoke with his mother, or what precisely she said to him. (The line of questioning that could have provided the evidence was erroneously cut off by the trial judge at defense counsel's behest.[12]) Yet, the circumstantial evidence certainly supports the finding of the Ohio Supreme Court. Det. Davis testified that he spoke with Van Hook's mother before leaving for Florida and that, after their conversation, he believed her son might want to talk with him. If Van Hook's mother did not speak with Det. Davis after the arrest and tell him something that led the detective to believe her son might want to talk, there are two possible alternatives: (1) they spoke before his arrest about his wanting to talk with the police; or (2) they spoke before his arrest, but not about anything which would have led the detective to believe that her son might want to talk with the police—i.e., the detective testified falsely.[13] As to the former alternative, it strains credulity to suggest that Van Hook's mother informed the detective that her son might be willing to talk with the police before he was actually apprehended. Van Hook was, after all, actively fleeing from authorities until his arrest. As to the latter alternative, Van Hook has not shown by clear and convincing evidence that Det. Davis testified falsely. While the prosecution did have the burden of proof, any successful attack on Det. Davis's veracity could have been based on supporting testimony by the other parties to the conversation. For instance, Van Hook could have provided direct evidence that his mother did not tell the detective anything that would have led the

---

[12]Following is the relevant excerpt from Det. Davis's testimony:

> Q.      -- and the reason --.  Had you had communication with Mr. VanHook's mother before going to Florida?
> A.      Yes, sir.
> Q.      And, had she indicated to you that she had talked to Mr. VanHook?
> A.      She had.
> Q.      And did she indicate to you anything that Mr. VanHook had told her?
> [Defense counsel]:      To which I object.
> THE COURT:      Objection will be sustained.
> Q.      After speaking with Mrs. VanHook, did you think that Robert VanHook might want to talk to you?
> [Defense counsel]:      To which I object.
> THE COURT:      Overruled.  you may answer that.
> A.      Yes, I did.
> Q.      And why was that?
> [Defense counsel]:      To which I object.
> THE COURT:      Just a moment.  Objection overruled.
> A.      She had told me --
> THE COURT:      Just a moment, sir.
> A.      I'm sorry.
> THE COURT:      My apologies.  I sustained the objection rather than overruled.
> Pardon me.

JA 3790-91. Defense counsel's objections were presumably grounded on hearsay concerns. Hearsay, however, is admissible in a suppression hearing under Ohio Rules of Evidence 101(C)(1) and 104(A). *Van Hook*, 530 N.E.2d at 893.

[13]There are two other alternatives: (3) the two spoke after Van Hook's arrest, but not about her son wanting to talk with the police; or (4) the two never spoke. Alternative (3) contradicts Van Hook's own position that the two did not speak after his arrest. As for Alternative (4), Van Hook concedes that the two had spoken on numerous occasions before his arrest.

detective to believe he wanted to talk by simply having her testify. Similarly, Van Hook himself could have testified at the suppression hearing (without jeopardizing his trial right to silence) and contradicted the detective's testimony. Yet, neither his mother nor Van Hook himself testified at the hearing. Review of the record confirms that the most plausible factual inference consistent with the record is the one made by the Ohio Supreme Court, and that inference is certainly not "unsupported" by the record nor has it been refuted by clear and convincing evidence.[14]

As to the particulars of the discussion between the mother and Det. Davis, the state court's conclusion that the content is nonetheless clear is also fairly supported by the record. Given the realities of the custodial relationship, it is inevitable that the police will sometimes receive information from a suspect or a third party which *might* evince a willingness and a desire to talk by the suspect. For example, they may hear something like "Well, what is going to happen to me now?" (said by the suspect in *Bradshaw*, 462 U.S. at 1045) or that a suspect "needed to talk to somebody about a murder" (said by the cellmate of the suspect in *Michaud*, 268 F.3d at 735). In this type of situation, the police may "inquire whether [the suspect] was re-initiating communication." *Michaud*, 268 F.3d at 735-36 (citing *Bradshaw*, 462 U.S. at 1045-46). Det. Davis testified that, based on what the mother told him, he believed her son might want to talk to police. This was enough to justify a limited inquiry to confirm or disaffirm that belief.

For these reasons, we find no clear error in the Ohio courts' factual findings. Upon subjecting these findings and the other, undisputed facts outlined above to our legal standard for initiation, we conclude Van Hook did initiate a discussion with the police.

**IV**

The Constitution protects a suspect from official coercion—it does not protect a suspect from himself or his mother. Van Hook asked for a lawyer but later changed his mind and wanted to talk with the police, as he had the right to do. Whether he then directly told the police himself that he changed his mind or instead indirectly communicated it through his mother and subsequently confirmed it himself is of no constitutional moment. We **AFFIRM** the district court's denial of habeas relief to Van Hook on the claim that his statement should have been suppressed.

Van Hook has raised several other claims of error which were not addressed by the original panel of this court. We return those claims to the panel for review and decision.

---

[14]In his dissent, Judge Merritt likewise focuses on the lack of evidence establishing precisely when Det. Davis and Van Hook's mother spoke. Yet, viewing the record as a whole, there is absolutely *no question* Van Hook talked with his mother and, based on that conversation, changed his mind and wanted to talk with the police without a lawyer. On the most vital issue before us, the record is clear: prior to Det. Davis's arrival, Van Hook had formed a willingness and a desire to talk with the police without a lawyer.

———————————

**DISSENT**

———————————

R. GUY COLE, JR., Circuit Judge, dissenting. The Court today adopts the position that law-enforcement officers may renew contact with criminal suspects upon learning from third parties that the suspects are willing to waive their previously invoked right to counsel. In so holding, the majority concludes that neither reason nor established case law require suspects—who, by definition, are in jail surrounded at all times by law-enforcement personnel—to directly communicate to police their wish to waive their previously invoked constitutional rights. The Supreme Court has instructed us that we must view custodial waivers of rights with a high degree of suspicion. In my view, we must be doubly skeptical of a waiver of rights effected through the backdoor of a purported third-party agent, especially when all the suspect has to do is proclaim to the nearest guard, "I want to talk."

Because I believe that only the suspect or his attorney may initiate discussions with the police (defined broadly to include other corrections officers) after a suspect has invoked his right to counsel, I respectfully dissent. Further, even assuming that third-party initiations are permissible, I disagree with the majority's conclusion that the record in this case establishes that Van Hook reinitiated communication with the police through his mother.

**I.**

**A.**

*Edwards v. Arizona*, 451 U.S. 477 (1981), creates the brightest of bright-line rules: If a suspect invokes his constitutional right to counsel, the police must immediately terminate their questioning. The interrogation may be renewed only if the suspect "himself" initiates further conversation "with the police." *Id.* at 485. There is no doubt that police officers who ask a suspect hours or days after the suspect invoked his right to counsel whether he was now ready to talk would be guilty of the very "badgering" that *Edwards* proscribes. *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983); *see also United States v. Johnson*, 400 F.3d 187, 193-94 (4th Cir. 2005), *cert. denied*, 546 U.S. 886 (2005) (holding that police violated *Edwards* where an officer re-entered the interrogation room forty minutes after the suspect requested a lawyer to see if the suspect would waive his rights). Indeed, even if the police have reason to believe that a suspect is ready to waive his previously invoked rights, the police are prohibited from initiating contact with him. *See United States v. Rodriguez*, 993 F.2d 1170, 1174 (5th Cir. 1993) (concluding that the police improperly renewed questioning of the suspect where a co-defendant contacted the police to say that "they" wanted to speak but it was not clear to whom "they" referred); *Desire v. Attorney Gen. of Cal.*, 969 F.2d 802, 804-05 (9th Cir. 1992) (holding that the police wrongly initiated contact where the officer overheard a conversation between the suspect and his co-defendant and in response, asked the suspect whether he "wanted to talk about anything"). Nonetheless, the majority holds that the police may do this very thing—ask a suspect whether he wants to talk after a suspect has invoked his right to counsel—without offending *Edwards*, so long as the police learn from a third party that the suspect is willing to submit to their questioning.

At first blush, there does not appear to be anything extraordinary or untoward about authorizing police to renew custodial interrogations when third parties, such as family or friends, tell the police that the suspect is prepared to answer questions without the assistance of counsel. But here we must pause and review what we know. The suspect has been taken into custody and has been read his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). He has terminated law enforcement's questioning by unambiguously invoking his right to counsel. He has preserved that right by maintaining his silence. At some point, according to the majority, the suspect

changes his mind, perhaps while conferring with a family member or friend, and decides that he will waive his right to counsel after all. So committed to reversing course and so desirous of speaking is the suspect, that he does a strange thing: He does not tell the people that he wants to talk to, i.e., the police, that he wants to talk to them. He tells someone else, someone who is not a police officer.

The majority overlooks this logical flaw. Rather than concluding, as *Edwards* commands, that if a suspect genuinely wishes to waive his previously invoked right to counsel and answer law enforcement's questions, the suspect will so inform the police directly, the majority endorses the counter-intuitive proposition that we may treat a suspect as willing to talk to the police despite his silence to the police. *United States v. Michaud*, 268 F.3d 728, 741 (9th Cir. 2001) (Reinhardt, J. dissenting) ("The whole point of *Edwards* is that a suspect who has invoked her right to counsel may remain silent, and may not be questioned unless she breaks that silence . . .").

In addition to eviscerating *Edwards*, the majority's holding deviates from the clear import of the Supreme Court's jurisprudence on custodial interrogations. It is to that I now turn.

**B.**

As the majority correctly explains, *Miranda* and its "corollary," *Edwards*, have dual purposes, including safeguarding a suspect's exercise of his constitutional rights in the face of the state's disproportionate power and providing clear guidance to law enforcement in how to handle custodial interrogations. *Arizona v. Roberson*, 486 U.S. 675, 680 (1988) (describing *Edwards* as a "corollary" to *Miranda*). The majority further acknowledges that the Supreme Court has praised the "relativ[e] rigid[ity]" and "clear and unequivocal" nature of the *Miranda* and *Edwards* rules as one of their chief benefits. *Fare v. Michael C.*, 442 U.S. 707, 718 (1979); *Roberson*, 486 U.S. at 682. Indeed, "[t]he merit of the *Edwards* decision," according to the Supreme Court, "lies in the clarity of its command and the certainty of its application." *Minnick v. Mississippi*, 498 U.S. 146, 151 (1990); *Roberson*, 486 U.S. at 680 ("As we have stressed on numerous occasions, one of the principal advantages of *Miranda* is the ease and clarity of its application.") (internal quotation marks and citation omitted).

Although the majority pays lip service to these precepts, it never comes to terms with their central place in the Supreme Court's custodial-interrogation jurisprudence. Coursing unmistakably through the Court's doctrine is the insistence that the relationship between a criminal suspect and his official interrogator be governed by "bright-line" rules that precisely spell out the rights and duties of both parties. *Roberson*, 486 U.S. at 681 ("We have repeatedly emphasized the virtues of a bright-line rule in cases following *Edwards* as well as *Miranda*."); *Minnick*, 498 U.S. at 151 ("*Edwards* . . . implements the protections of *Miranda* in practical and straightforward terms."). The Supreme Court has determined that in this area of the law, neither suspect, nor police officer, nor the public at large, is well served by rules that tolerate ambiguity or require nuanced decisionmaking. The Court's unflagging commitment to "clarity" is motivated by the recognition that the coercive setting of custodial interrogation is ready-made for the infringement, whether intentional or inadvertent, of constitutional protections, such that suspects must be plainly advised of their rights so they may act on them. *See Dickerson v. United States*, 530 U.S. 428, 435 (2000) ("Because custodial police interrogation, by its very nature, isolates and pressures the individual, we stated that 'even without employing brutality, the "third degree" or other specific stratagems, custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals.'") (quoting *Miranda*, 384 U.S. at 455); *Bradshaw*, 462 U.S. at 1044 (describing *Edwards* as a "prophylactic rule" intended "to protect an accused in police custody from being badgered by police officers"). Furthermore, law enforcement must be advised about the limits of its authority, so that it is not subjected to judicial second-guessing as to its methods, or burdened by undue complexity in the discharge of its investigatory work. *Davis v. United States*, 512 U.S. 452, 461 (1994) (describing *Edwards* as providing "a bright line that can be applied by officers in the real

world of investigation and interrogation . . ."); *Fare*, 442 U.S. at 718 (stating that the "relatively rigid requirement that interrogation must cease upon the accused's request for an attorney . . . has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation . . ."); *Miranda*, 384 U.S. at 441-42 (describing one of the purposes of the decision as providing "concrete constitutional guidelines for law enforcement agencies and courts to follow").

The Supreme Court has steadfastly guarded the "bright-line" quality of the *Edwards* rule. The Court has applied *Edwards* to new factual scenarios where it deemed doing so necessary to uphold the rule's essential clarity, but has resisted applying *Edwards* where the result would be to muddy its dictates. Several cases illustrate the point.

In *Minnick*, the Court addressed whether *Edwards* is satisfied where the suspect has invoked his right to counsel and has been afforded an opportunity to consult with his lawyer prior to interrogation, but the lawyer is not physically present during the interrogation. The Court concluded that the ability to consult was insufficient to allow interrogation, in part because such an exception "would undermine the advantages flowing from *Edwards'* 'clear and unequivocal' character." 498 U.S. at 154. Suspects' rights would be jeopardized because the quality of consultations would vary widely, ranging from "a telephone call to say that the attorney is en route, to a hurried interchange between the attorney and client in a detention facility corridor, to a lengthy in-person conference in which the attorney gives full and adequate advice . . . ." *Id.* at 155. Further, approving a consultation-only rule would entail unnecessary trouble for law-enforcement personnel: "[E]ven with the necessary scope of consultation settled, the officials in charge of the case would have to confirm the occurrence and, possibly, the extent of consultation to determine whether further interrogation is permissible." *Id.*

In *Davis*, the Court's decision was influenced in part by a desire to maintain the "clarity and ease of application" of the *Edwards* rule. 512 U.S. at 461. There, the Court held that a suspect's request for counsel must be unambiguous to trigger law enforcement's duty to terminate questioning. *Id.* at 459. The Court refused to require police to cease interrogation upon a suspect's ambiguous request for counsel because to do so would force police officers "to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong." *Id.* at 461; *see also Moran v. Burbine*, 475 U.S. 412, 425 (1986) (upholding a suspect's waiver of his rights where law enforcement failed to tell him that his lawyer attempted to reach him, because not upholding the waiver would "mudd[y] *Miranda's* otherwise relatively clear waters" and "spawn" a host of legal questions).

Perhaps most telling is the Court's recent decision in *Dickerson*, reaffirming *Miranda*. The *Dickerson* Court confronted the question of whether *Miranda* had to yield to a Congressional statute that dispensed with *Miranda's* required warnings by instead embodying a totality-of-the-circumstances test for assessing the voluntariness of a criminal defendant's confession. *Dickerson*, 530 U.S. at 428. In declining to overrule *Miranda*, the Court held that the popularly known "*Miranda* rights" had been broadly embedded in society. *Id.* at 443-44. In addition, *Miranda* constituted a rule that could be more easily administered by law enforcement, compared to the one enacted by Congress: "[E]xperience suggests that the totality-of-the-circumstances test which [the statute] seeks to revive is more difficult than *Miranda* for law enforcement officers to conform to, and for courts to apply in a consistent manner." *Id.* at 444.

Thus, it is evident that the Supreme Court regards clarity and ease of application as necessary features of any legal rule governing custodial interrogations and that the Court eschews proposed modifications that fail this test.

## C.

To hold as the majority does today, that a suspect may re-initiate interrogation through a third party, contravenes the reasoning of the Supreme Court's custodial-interrogation jurisprudence by inviting the very uncertainty and complexity into the circumstances surrounding a suspect's waiver of his rights that the Court has sought to banish. This uncertainty and complexity ensnares both the suspect and the law-enforcement officers in charge of his case.

First, the majority's interpretation of *Edwards* allows the police to approach a suspect even when the suspect does not initiate further communication through a third party. While in custody, a suspect may have occasion to confer with family, friends, or other third parties. The suspect will have no reason to know that he could be opening himself up to renewed police contact if the third party misconstrues or ignores what he says and tells the police that the suspect is prepared to waive his right to counsel and talk with them. It does not take much imagination to realize the "lost in translation" problems that inhere, in the majority's preferred locution, in "person-to-person-to-person" communications. Maj. Op. at 6.

For example, during conversations with third parties, the suspect might equivocate in his decision not to speak with the police, might speculate about whether making a statement would ameliorate his situation, and might even express agreement with advice encouraging him to tell the police what he knows. Even though such statements reveal no more than the suspect's current mental state, and hardly constitute a request for the police to re-start their interrogation, they could easily be passed on to the police, or interpreted by the police, as declarations of the suspect's desire to talk. Similarly, third parties' communications with the police may be colored by their own views as to what is in the suspect's best interests, and may not accurately reflect the suspect's own intentions on how to proceed.

The majority's reliance on cases from the Eighth, Ninth, and Eleventh Circuits upholding third-party initiations as permissible under *Edwards* only serves to illustrate the danger of such a rule. In *Owens v. Bowersox*, 290 F.3d 960 (8th Cir. 2002), *United States v. Gonzalez*, 183 F.3d 1315 (11th Cir. 1999), and *United States v. Gaddy*, 894 F.2d 1307 (11th Cir. 1990), there was no evidence about what the suspect said to the third party to make the latter believe that the suspect wanted to talk, nor was there any discussion of the accuracy and reliability of the third party's representations to the police. In *Michaud*, there was no evidence that the defendant told her cellmate that she wanted to talk to the police; the cellmate apparently concluded on her own that Michaud "needed to talk to somebody" as a result of Michaud's distraught state, and further concluded that a police officer was the necessary "somebody." *Michaud*, 268 F.3d at 739-40 (Reinhardt, J. dissenting).

While acknowledging the potential for errors in the transmission of information from the suspect to a third party to the police, the majority minimizes this concern by arguing that even if a suspect tells the police that he wants to talk, the corrections officer with whom the suspect initiates communication will seldom be the investigating officer assigned to his case. The majority therefore reasons that a suspect's desire to talk will almost invariably travel through a third party, namely, a third-party corrections officer. I agree. The majority is quite right when it says that "[d]etectives and investigating officers do not typically act as guards roaming all day the areas directly adjacent to holding cells." Maj. Op. at 10.

Where I part company with the majority is in its assumption that a suspect's communication to a law-enforcement officer, even one that is not assigned to his case, counts as an initiation through a third party. It makes no sense to say that a third-party corrections officer and a third-party family member, friend, or cell-mate are the same thing for purposes of applying *Edwards*. Indeed, a corrections officer is not a "third party" at all.

It goes without saying that the relationship between the suspect and the police—defined broadly to include corrections personnel beyond just the investigating officer—is adversarial. Is it possible, as the majority muses, that a suspect might make statements to a prison guard that the guard misinterprets as "evinc[ing] a willingness and a desire for a generalized discussion about the investigation"? *Bradshaw*, 462 U.S. at 1045-46. Of course. But that is the risk the suspect takes when he voluntarily chooses to discuss his case with a law-enforcement officer. Such a situation does not involve a "third party" in the relevant sense because the suspect "himself" has initiated communication "with the police," even if he has not initiated communication directly with the investigating officer responsible for his case, which *Edwards*, on its face, does not require. For these reasons, the majority misses the mark when it contends that a suspect might prefer to initiate communication through his mother, rather than through his prison guard, because "[f]rom the suspect's perspective," his mother is the more trustworthy party. A suspect who tells his guard that he wants to talk is not initiating communication to the police "through" anyone; he is speaking directly to them.

As we have seen, the majority is not interested in examining the nature of the communication between the suspect and the third party, nor is it troubled by the way in which a suspect's intentions could be misinterpreted or ignored by a third party. Instead, the majority contends that any concerns about the accuracy of the communication from the suspect to the third party to the police can be easily put to rest by having the police confirm the suspect's "willingness and desire" to talk before renewing their interrogation. *Bradshaw*, 462 U.S. at 1045-46 (holding that an initiation occurs when a suspect makes a statement that evinces "a willingness and a desire for a generalized discussion about the investigation"); *United States v. Whaley*, 13 F.3d 963, 966 (6th Cir. 1994).

According to the majority then, once the police have learned from a third party that a suspect wishes to waive his rights and talk, the police may resume contact with the suspect to verify the third party's representation. The majority fails to explicate the content of this "limited inquiry" that law enforcement may conduct. More importantly, the majority turns the *Edwards* rule on its head by holding that a suspect initiates communication with the police only after the police ask him if he wants to talk: An initiation occurs "[w]hen the police receive information that a suspect wants to talk; when there is a sufficient basis for believing its validity; and *when the police confirm with the suspect the validity of that information*." Maj. Op. at 21-22 (emphasis added). As explained above, the police cannot approach a suspect to discuss the case unless an initiation by the suspect has already occurred. *Oregon*, 462 U.S. at 1039; *Johnson*, 400 F.3d at 187. It is the suspect's initiation that gives the police license to ask him if he is prepared to waive his rights and answer questions; police contact prior to an initiation, or for purposes of sparking an initiation, is a clear violation of *Edwards*. Thus, contrary to the majority's assertion, the better reasoned view is that a third-party initiation occurs, if at all, when the third party conveys to the police the suspect's alleged desire to talk without the aid of counsel.

Here we encounter the second layer of uncertainty and complexity that plagues third-party initiations, this time for law enforcement. The majority says that the police will have to have "a sufficient basis for believing" the third party's representations before they may resume contact with the suspect. We are left to guess about what constitutes a "sufficient basis," and so are the police. Even though the Court's opinion lands law enforcement on uncertain terrain, the majority chooses not to spell out any rule to guide police conduct in responding to an alleged third-party initiation. Of course, any attempt to do so immediately runs afoul of the Supreme Court's admonition that the rules governing custodial interrogation should not put law-enforcement officers in the position of making "difficult judgment calls." *Davis*, 512 U.S. at 461. But that is exactly what will happen.

To overcome the "heavy" presumption against a custodial suspect's waiver of his rights, *Moran*, 475 U.S. at 450-51 (Stevens, J. dissenting), the prosecution will have to show that the police had a reasonable and good-faith basis for believing that the suspect communicated an intention to

talk through the third party. This, in turn, will compel the police to verify that a conversation between the suspect and the third party actually occurred, and to assess the credibility and motivations of the third party. In addition, the police will have to examine the reliability of the purported waiver by probing the third party about exactly what the suspect said and in so doing, exercise their discretion in deciding whether the suspect's statements sufficiently express a "willingness and desire" to talk such that police may approach him. Among the more obvious questions that the majority's opinion will relegate to police officers include: Who may be regarded as a proper third party agent? What words must a suspect use to show that he is prepared to waive his rights? Is it enough for the suspect to agree with a third party's recommendation that he talk, or must he affirmatively say that he "will" talk? What if the suspect says he will talk but never instructs the third party to so advise the police?

The Supreme Court instructed us in *Davis* that it is asking too much of law-enforcement officers to require them to assess whether a suspect is invoking his right to counsel even when the suspect is in the presence of police officers who can directly observe him and hear his statements first-hand. If that is the case, then I fail to see how it is not asking too much of law enforcement to assess a suspect's intention to waive his rights where that purported intention is not communicated openly to the police, but is relayed through a third party.

Ultimately, of course, the complicated questions surrounding third-party initiations will end up in the courts. To sort out the mess, courts will be compelled on a case-by-case basis to develop new standards for adjudicating the propriety of third-party initiations. In the end, we can safely conclude that the hallmark "clarity" and "certainty of [] application" of the *Edwards* rule will be lost. *Minnick*, 498 U.S. at 151.

### D.

Finally, it cannot be ignored that the majority's opinion creates a glaring asymmetry in the law of custodial interrogations. A suspect cannot invoke his right to counsel through a third party. It would be impossible for a suspect to satisfy *Davis's* "unambiguous" requirement for invoking the right to counsel without the suspect himself telling the police that he wants a lawyer. *Davis*, 512 U.S. at 459 (stating that a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney"). Moreover, the Supreme Court has held that a suspect's own lawyer cannot protect his right to counsel for him. *Moran*, 475 U.S. at 425 (holding that the police were not required to refrain from questioning the suspect, even where the suspect's attorney contacted the police to ensure that he would not be questioned outside the presence of counsel, because the suspect himself did not tell the police that he wanted a lawyer).

Here, the majority adopts the opposite approach: A third party who could not invoke the accused's right to counsel may nonetheless play a crucial role in bringing about the waiver of that right. It makes no sense to apply different standards to the invocation of constitutional rights and the waiver of those same rights. Nonetheless, such is the paradox the majority has wrought.

The majority rejects this characterization on the grounds that "[t]he symmetrical opposite of '*invoking* the right to counsel,' is not initiating a discussion but rather *waiving* the right to counsel." Maj. Op. at 21 (emphasis in the original) (internal citation omitted). True, initiation alone does not amount to a waiver that enables the police to re-start their questioning. A suspect must both initiate communication with the police and knowingly and intelligently waive his right to counsel. Although initiation and waiver are separate inquiries, a proper initiation (i.e., where the suspect initiates a dialogue with the police in which he expresses "a willingness and a desire for a generalized discussion about the investigation") is indispensable to finding a valid waiver. *Edwards*, 451 U.S. at 486, n. 9 (stating that the validity of the waiver depends on whether it was knowing and

intelligent under the totality of the circumstances, "including the necessary fact that the accused, not the police, reopened the dialogue with the authorities"). Indeed, a knowing and intelligent waiver will not cure an improper initiation, i.e., an initiation at the behest of the police. As the Supreme Court stated in *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991), "[i]f the police do subsequently initiate an encounter in the absence of counsel . . ., the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards."

Thus, because initiation remains bound up with the suspect's waiver, and because the majority holds that the initiation can occur through a third party, the majority's opinion does indeed give third parties an authority to act on the suspect's behalf in bringing about the waiver of his constitutional rights that those same third parties are not accorded when it comes to invoking the suspect's rights in the first place. Under the majority's holding, the police may renew contact with a suspect based on a third party's representations that the suspect wants to talk without the aid of counsel. In contrast, the police need not terminate their questioning based on a third party's representations that the suspect wants a lawyer. If the law demands that the suspect act on his own in requesting a lawyer, then I cannot fathom why he is any less competent to act on his own in rescinding that request, the necessary first step of which is initiating communication with the police.

## II.

Having explained why allowing third-party initiations constitutes a departure from *Edwards* and the Supreme Court's custodial-interrogation jurisprudence generally, I turn now to the question of whether, even if *Edwards* did not prohibit third-party initiations, there is sufficient evidence to conclude that Van Hook initiated communication with the police through his mother.

The majority correctly notes that on habeas review, we presume that the factual findings of the Ohio Supreme Court are correct. We may set aside those findings only if one of the eight exceptions in 28 U.S.C. § 2254(d)(1)-(8) (the pre-AEDPA statute that governs our review) is satisfied. Van Hook argues that subsection (8) applies because the record does not support the Ohio Supreme Court's factual determination that he initiated communication with the police through his mother. I agree.

When Van Hook was apprehended by the Florida authorities on April 1, 1985, he invoked his right to counsel. That same day, the Florida police officers alerted Cincinnati Detective William Davis, who was in charge of the investigation into Self's murder, that they had taken Van Hook into custody. Detective Davis and his Homicide Squad colleague, Kerry Rowland, immediately flew to Fort Lauderdale and went straight to the Broward County jail. There is no dispute that before he began his interrogation, Detective Davis knew that (1) Van Hook had invoked his right to counsel, (2) Van Hook himself did not contact either Cincinnati or Florida law-enforcement personnel to tell them that he wanted to talk, and (3) Van Hook did not ask anyone else to contact Detective Davis on his behalf to ask Detective Davis to come to the Florida jail. Despite these uncontroverted facts, the majority concludes that it was entirely consistent with *Edwards* for Detective Davis to have arranged for Van Hook's transfer to an interrogation room at the Florida jail, and once there, to have advised Van Hook that he and Detective Rowland "had a lot to talk to him about." No *Edwards* violation occurred, according to the majority, because on the day he flew to Fort Lauderdale, Detective Davis spoke to Van Hook's mother, who said something that made Detective Davis believe that Van Hook wished to speak with him.

Here the problems with third-party initiations discussed in Part I come alive. All the record establishes is that Detective Davis believed, after talking with Van Hook's mother, that Van Hook was willing to make a statement. We do not know what Van Hook's mother said to Davis that convinced Davis that Van Hook wanted to talk. We do not know, for instance, whether Van Hook's

mother suggested to Davis that Van Hook would talk because (1) she had urged Van Hook to cooperate with the police, (2) her familiarity with her son and his mental state led her to believe that he wanted to talk, or (3) Van Hook unambiguously told her that he wanted to confess. Van Hook's mother may have misconstrued his comments, she may have been speaking out of her own subjective beliefs and motivations, or she may have accurately reported Van Hook's statements, which may or may not have been sufficient to show Van Hook's "willingness and [] desire for a generalized discussion about the investigation." *Bradshaw*, 462 U.S. at 1045-46. The point is that we do not know because the record is silent on these issues.

Similarly, we do not know what Van Hook said to his mother that prompted her to tell Detective Davis whatever she told him. Although Van Hook told Detective Davis in the Florida interrogation room, "I talked to my Mom today an' she jus' told me, you know, be cooperative an' jus' tell the truth," this statement tells us only what Van Hook's mother recommended that he do. It in no way establishes that Van Hook told his mother that he wanted to talk with the police, nor does it establish that he asked his mother to inform the police of his desire to talk.

The faulty factfinding of the Ohio Supreme Court in concluding that the record supported the proposition that Van Hook initiated communication through his mother did not go unnoticed by the dissenting members of that court. Justice Wright aptly summarized his colleagues' reasoning:

> There is not a scintilla of evidence in the record to show that the appellant initiated further discussion. The court justifies its holding by drawing one inference from another. It infers that the appellant initiated further discussion from the inference about what appellant's mother supposedly stated to Officer Davis. This is guesswork about facts which are not in the record. Such inference building undermines the constitutional foundations upon which *Bradshaw*, *Fields*, and *Edwards* . . . are built.

*Ohio v. Van Hook*, 530 N.E.2d 883, 894 (1988) (Wright, J., dissenting).

I believe that the Ohio Supreme Court's factual finding is not entitled to any deference from this Court because the evidence is not sufficient to show that Van Hook initiated communication with the police through his mother. Accordingly, I would grant Van Hook's petition for habeas relief.

### III.

In holding that custodial suspects may initiate communication with the police through a third party other than his attorney, the majority today repudiates the only interpretation of *Edwards* that is consistent with the Supreme Court's custodial-interrogation jurisprudence. Applying its new rule, the majority infers, based on evidence that is not in the record, that Van Hook initiated communication with the police through his mother. Because I believe that the majority's endorsement of third-party initiations impermissibly heightens the risk of constitutional error, and that such an error has occurred in this case, I respectfully dissent.

---

**DISSENT**

---

MERRITT, Circuit Judge, dissenting. Judge Cole's opinion convinces me that once the accused has invoked his right to counsel, as here, the police may no longer interrogate him unless he either reinitiates interrogation himself directly or reinitiates interrogation through the counsel he has requested. After the accused has requested counsel, the police should not be able to importune him through relatives, friends, fellow inmates, prison guards or the press to subject himself to further interrogation. The Supreme Court has been strict in its enforcement of the *Edwards* rule.

Even if we permitted third party initiation, the State — at a minimum — would have to prove that (1) after invoking his right, the accused himself initiated contact on his own through a third person, (2) the third person contacted the police after the accused invoked his right, and (3) the waiver of the previously invoked right did not arise because the police encouraged the third person to convince the accused to break his silence and confess without counsel. The State has proved none of these elements in this case. There is no basis in the record before us for concluding (1) that Van Hook asked his mother to have the police contact him after he invoked his right, (2) that Van Hook's mother told the police that Van Hook had changed his mind after invoking his right and now wanted to talk, or (3) that the claimed waiver did not involve police efforts to get Van Hook's mother to convince him to talk to them.

Detective Davis himself testified that neither Van Hook himself nor any third person on behalf of Van Hook had asked for renewed police contact:

> Q.      And did you receive any information, either in your phone conversation with Detective Moody or upon your arrival in Ft. Lauderdale indicating that Mr. VanHook desired to talk to you?
>
> A.      No.
>
> Q.      So it's fair to say that when you arrived in Ft. Lauderdale, all you knew at that point was that Mr. Vanhook was in custody, is that correct?
>
> A.      Correct.
>
> . . . .
>
> Q.      But you knew when you went into that interview room that he had in fact requested to speak to an attorney, or indicated he would like to have an attorney present before speaking with members of law enforcement, is that correct?
>
> A.      Yes, I was advised of that earlier by phone.
>
> Q.      When you left Cincinnati for Ft. Lauderdale, you knew that Mr. VanHook had indicated that he did not wish to speak with police officers until after he had consulted with an attorney, is that accurate?
>
> A.      I knew that he did not want to talk to police officers at that time. At the time of his arrest.
>
> Q.      And at 9:35 [P.M.] on that April 1st then you advised him of his rights?

A.       Correct.

Q.       And this is after you advised him that you had a lot to talk about, he indicated he had talked with his mother, and that he wished to talk to you at that time?

A.       Yes, sir.

Q.       *And it's your testimony today that he didn't call or he didn't have anybody call you and say to come to the jail when you arrived in Ft. Lauderdale, that he wanted to talk with you?*

A.       *That's correct.*

(Emphasis added, App. 370-81, 3784, 3785-86.)

Detective Davis had several telephone and in-person conversations with Van Hook's mother while Van Hook was on the lam in Florida. It may be that Detective Davis told Van Hook's mother before the police found and arrested Van Hook that she should get Van Hook to turn himself in and confess his crime. And it may be that when she talked to her son before and after he was arrested, that she told him that Davis wanted to talk to him and that he should "tell the truth." But there is nothing in the record at all to suggest that after invoking his rights Van Hook reinitiated contact with police through his mother. Detective Davis' testimony is to the contrary. There is no fact or reasonable inference from a fact that Van Hook's mother even talked to the police after Van Hook invoked his right to counsel.

The majority opinion appears to claim that all of the Ohio Supreme Court conclusions are factual findings to which we are obligated to defer under § 2254(d)(8), title 28 (pre-AEDPA). This rendition of our standard of review does away with the normal rule that the application of a constitutional rule or standard to the facts is a mixed question of law and fact calling for *de novo* review. *See*, *e.g.*, *Brown v. Allen*, 344 U.S. 443, 507 (1953) ("Thus, so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge"); *Miller v. Fenton*, 474 U.S. 104, 115 (1985) ("For several reasons we think it would be inappropriate to abandon the court's longstanding position that the ultimate question of admissibility of a confession merits treatment as a legal inquiry requiring plenary federal review"). This same standard of review is used in many other areas of constitutional review of state action. *See*, *e.g.*, *Bose Corp. v. Consumers Union*, 466 U.S. 485, 508 n. 27 (1984) ("The simple fact is that First Amendment questions of 'constitutional fact' compel this Court's de novo review"); *Adams v. Turner*, 44 U.S. 590, 600 (Brandeis, J., dissenting); ("*Ex facto jus oritur* [the law arises out of the fact]. That ancient rule must prevail in order that we may have a system of living law.").

When we look at the record as a whole, including the police records showing contacts between Cincinnati police and Van Hook's family, and apply the constitutional rule to the facts, it is clear that there was no contact between Cincinnati police and Van Hook's mother or family on the day of Van Hook's arrest, or any reinitiation by Van Hook through anyone else.

Counsel for Van Hook reports in his brief pages 10-11 an "exhaustive examination" of police records of all contacts with Van Hook's family during their successful efforts to find him and have him arrested in Florida:

An exhaustive examination of the Cincinnati Police Department's file on Robert Van Hook reveals no mention is made in 776 pages of police records, reports, and notes (contained in the joint appendix) to any conversation between Van Hook's mother and police between the time Van Hook requested counsel and police reinitiated interrogation in violation of *Edwards*. (Police Records, Apx. Vol. 14-15,

pp. 4780-5554).

The records of the Cincinnati Police Department detail conversations with Van Hook's mother on seven separate occasions: (1) Officer Davis has Detective Weber call Van Hook's mother on 2/26/85 (*Id*. at Vol. 14, pp. 4897, 5171); (2) Officer Davis has Detective Weber call Van Hook's mother on 3/5/85 (*Id*. at 4914); (3) Officer Davis has Michael Ramsey call Van Hook's mother on 3/5/85 (*Id*.); (4) Van Hook's mother calls Detective Weber on 3/11/85 (*Id*. at 4919, 5174); (5) Officers Hennekes, Davis, and Rowland speak with Van Hook's mother at her house on 3/13/85 (*Id*. at 4922-24); (6) Officers Hennekes and Davis return to Van Hook's mother's house and put tracer on her phone on 3/14/85 (*Id*. at 4928); and (7) Officer Hennekes receives a call from Van Hook's mother on 3/21/85 (*Id*. at 4935).

The Cincinnati police file indicates a subpoena was issued for Van Hook's mother's phone records 3/7/85 (*Id*. at 4917). And Van Hook's mother's phone records are included in the police file as well. (*Id*. at Vol. 15, pp. 5348-55). The file also includes references to phone calls with Van Hook's step-mother 3/6/85 (*Id*. at Vol. 14, pp. 4930-31). Van Hook's father 3/7/85 (*Id*. at 4931), and van Hook's uncles 3/7/85 (*Id*. at 4916). Yet, conspicuously absent from the 776 page file of the Cincinnati Police Department is any mention of a conversation with Van Hook's mother on the day of his arrest.

The majority does not even mention these records, Detective Davis' testimony or their effect on the State's claim that Van Hook reinitiated contact with the police through his mother. The majority's treatment of the case does not fall within any bright line rule based on *Edwards*, nor the more general *Edwards* standard that we "should indulge every reasonable presumption against waiver of fundamental constitutional rights" and that "doubts must be resolved in favor of protecting the constitutional claim," and that "it is the State that has the burden of establishing a valid waiver." *Michigan v. Jackson*, *supra*, 475 U.S. 625, 633 (1986), a case applying the reasoning of *Edwards*. The majority refuses to apply this standard or observe the admonition of the Supreme Court in *Michigan v. Mosley*, 423 U.S. 96, 110 fn. 2 (1975):

[T]he reason to keep the lines of communication between the authorities and the accused open when the accused has chosen to make his own decisions are not present when he indicates instead that he wishes legal advice with respect thereto. The authorities may then communicate with him through an attorney. More to the point, the accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism.

---

**DISSENT**

---

BOYCE F. MARTIN, JR., Circuit Judge, dissenting. I join the well-reasoned dissents of Judges Merritt and Cole. Both properly highlight the fundamental tenet of *Edwards v. Arizona*: that once a suspect asserts his right to counsel, he cannot be subject to further interrogation "until counsel has been made available to him, unless *the accused himself* initiates further communication, exchanges, or conversations *with the police*." 451 U.S. 477, 484-85 (1981) (emphasis added).

I fully agree with the majority that when faced with an issue or set of circumstances that the Supreme Court did not address in its original decision, we may modify, extend, or restrict its ruling. I disagree with the majority, however, in its position that we may modify a ruling where the Supreme Court has already provided explicit language to guide us. And *Edwards* clearly explains that any re-initiation must be communicated by "the accused" to "the police."

To the extent that the majority's holding could be a defensible interpretation of *Edwards*, any arguments in its favor are completely undermined by the fact that its ruling is utterly impractical. The majority fails to provide a workable rule of uniform application. The test set forth by Judge Merritt in his dissent provides much more practical guidance for future panels of this Court and district courts faced with the issue of third party initiation. There is no reason why this test cannot at least inform future adjudication of cases involving this issue. Judge Cole's concern for the distinct probability of a suspect's communications to third parties becoming "lost in translation" further underscores the impracticality of today's decision. The Court's ruling does not merely amount to further erosion of *Miranda*, but the creation of a legal framework that is doomed to breed uncertainty and confusion.

For these reasons, I respectfully dissent.