PER CURIAM.
Donderrious Williams was convicted of capital murder, as that offense is defined in § 13A-5-40(a)(17), Ala.Code 1975, and was sentenced to life imprisonment without the possibility of parole. The Court of Criminal Appeals affirmed Williams’s conviction and sentence in an unpublished memorandum. Williams v. State (No. CR-07-0456, June 13, 2008), 26 So.3d 511 (Ala.Crim.App.2008)(table). Williams subsequently petitioned this Court for a writ of certiorari, arguing that the Court of Criminal Appeals erred by not reversing his conviction based on what Williams alleges was the trial court’s erroneous ruling on a motion to suppress statements Williams had made after invoking his right to counsel. We granted certiorari review to address whether the Court of Criminal Appeals correctly held that Williams’s request for counsel during his custodial interrogation was an ambiguous assertion of his Fifth Amendment rights and, if not, whether the police violated Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), when they reinitiated contact with Williams after he had requested counsel.

Facts and Procedural History

On November 30, 2005, the Birmingham Police Department received a telephone call regarding an unidentified male lying in an alleyway. The male, later determined to be Bryan Lewis, had suffered a gunshot wound and was pronounced dead at the scene. Police officers questioned Williams regarding Lewis’s killing on two occasions: on November 30, 2005, and December 14, 2005.
On November 30, 2005, when they first questioned Williams, officers advised Williams of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Williams waived those rights and agreed to talk with the officers. The officers audiotaped and videotaped the interview. After speaking with the officers for some time, Williams stated, “I need a lawyer, man. I would talk to y’all if I had a lawyer. I promise.” Williams then asked to make a telephone call; the officers would not allow it and told him that he would be in jail for at least two days. Williams stated that he had been questioned in another city regarding a different crime and that the officers there had allowed him to make a telephone call. The officers indicated that the crime under investigation here was a more serious crime.
The officers then explained to Williams what would happen next in the investigation' — that they would take him home, that *672 they would investígate the crime, and that he would be assigned a lawyer. The officer then stated, “You already asked for a lawyer, right?” to which Williams replied that he had not asked for a lawyer but that he would “take” one. Williams also stated that he did not do anything wrong. One of the officers ejected the audiocassette tape that had been recording the interview; however, the videotape of the interview continued to record. One of the officers stated that if Williams wanted to talk, Williams could reaffirm his rights; otherwise, the officers could not talk to him anymore. Williams responded that he was talking. The officers told Williams that he could get out on bond. Williams asked if he could telephone his girlfriend; he told the officers that if he was allowed to telephone his girlfriend, he would tell the truth. One of the officers allowed Williams to use the officer’s cellular telephone to make a telephone call while the officers left the interrogation room. Shortly thereafter, the officers returned. Williams asked who he was suspected of murdering. The officers showed Williams a photograph of Lewis. The officers asked Williams if he was ready to talk. Williams responded that he did not have anything to do with the murder, and one of the officers asked Williams to tell what he knew. Williams stated that the officers were trying to incriminate him, and Williams then stated either “If I had a lawyer, if I had a lawyer, I’d tell you everything,” or “If I had a lawyer, if I just had a lawyer, I’d tell you everything,” or “May I have a lawyer, if I had a lawyer, I’d tell you everything,” “I’m sorry.”[1] One of the officers told Williams that there was no need to apologize. At that point, the officers ended the interview and left the room.
Shortly thereafter, a police sergeant entered the interview room and told Williams that the sergeant needed to clarify whether Williams wanted to continue talking to the police. The sergeant asked if Williams was willing to answer a few questions or if he was absolutely invoking his right to counsel. Williams expressed his frustration with the officers who had been questioning him previously and said that they were trying to incriminate him. The sergeant asked if Williams was willing to answer a few more questions and told him that he was free not answer any of the questions. The sergeant told Williams that the detectives wanted to hear Williams’s story and that he would be released if the story checked out. The sergeant told Williams that he had not been charged with anything. Williams asked if the conversation had to be tape-recorded, and the sergeant told him that it did not. The sergeant told Williams that the evidence indicated that Williams had been involved in Lewis’s murder. Subsequently, Williams made incriminating statements to the sergeant.
The second interrogation occurred on December 14, 2005. Detective Eric Tor-rence was one of the officers who had originally questioned Williams, and he resumed the interrogation on December 14, 2005, recording the interview. Detective Torrence again informed Williams of his Miranda rights, and Williams agreed to talk. Williams then made incriminating statements to the detective.
Before trial, Williams filed a motion to suppress the statements he had made during the interrogations on November 30, 2005, and December 14, 2005. At that *673 time, the State indicated that it did not intend to offer the statements into evidence. The trial court denied the motion but noted that if the State attempted to use the statements, then Williams could renew the motion. At trial, the State determined that it did want to question one of the officers about the statements Williams had made during the interrogations. Williams objected. The trial court held a hearing outside the presence of the jury. Detective Torrence testified that after the initial interrogation on November 30, 2005, members of Williams’s family had contacted him and stated that Williams wanted to talk to the detective again, and Detective Torrence then interrogated Williams on December 14, 2005. Detective Torrence could not remember the names of the family members he says contacted him. Detective Torrence stated that Williams never “directly” stated that he wanted to talk with him again. After the hearing, the trial court ruled on Williams’s motion to suppress:
“This is my holding on this particular motion to suppress. I have to agree to a certain extent that based on the way the defendant referred to an attorney, I could see where the detectives are not clear whether he is saying he wants an attorney or he doesn’t want an attorney.
“He appeared to want an attorney initially even though it was ambiguous. And then when Sergeant Hardiman came in and tried to clear it up, it is not clear to me that it got cleared up.
“It is this. One thing led to another and they were talking about the circumstances and got back into a statement at a point to where it never was clear whether his assertion of an attorney initially was absolute or whether it was a mere reference.
“I am going to hold that any statement made up until the defendant referred to an attorney being present— because part of it is listed on your transcript as inaudible and you can hear a little bit more in the video — I am going to hold everything up to that point as admissible, everything in that 11/30, November 30, statement.
“After that is not admissible. When we get to the December 14, 2005, statement, I am holding that that is admissible. I am partially denying and partially granting the motion to suppress.”
When the jury returned and Detective Torrence testified regarding Williams’s statements, Williams objected. After a sidebar conference, Detective Torrence was allowed to testify. The trial court later allowed Williams to preserve his objection to the December 14, 2005, statement.
“THE COURT: Do you want to go ahead and state for the record what you said so that we can preserve your argument?
“MR. MAY [defense counsel]: Yes, sir, Your Honor. Judge, at the sidebar the defense objected to and renews our objection to the testimony of Detective Torrence’s interrogation/interview of Donderrious Williams on December 14, 2005.
“Specifically, Judge, using as a point of argument and reference the case of Minnick v. Mississippi, [498 U.S. 146 (1990) ]. In that case, Judge — and it is our argument that that is what we have in this — interrogation must cease and officials may not [reinitiate] interrogation without counsel present, whether or not the accused has consulted with his attorney.
“The Court in that case went on to hold that when an accused has invoked his right to counsel during present custodial interrogation, ... a waiver of that right cannot be established by showing *674 only that he responded to further police-initiated custodial interrogation, even if he has been advised of his rights.
“Further, an accused who has requested an attorney, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel had been made available to him unless the accused himself initiates further communication, exchanges, or conversation with the police.
“Judge, very briefly, what we will say in this case is that on November 30, 2005, when Mr. Williams requested counsel, that all interrogation at that point should have by law stopped. And the fact that he was read his Miranda rights any time subsequent to that, prior to him receiving an attorney is not permissible and that interrogation, that subsequent interrogation, is not allowed.”
Williams was convicted, and he appealed. The Court of Criminal Appeals, in its unpublished memorandum affirming his conviction, stated, with regard to the admissibility of the statements, as follows:
“[Williams] made two separate equivocal assertions regarding his light to counsel. In each instance, the officers immediately stopped questioning him about the offense and sought to clarify whether he was actually invoking his right to counsel before continuing with further questions about the offense. In each instance, [Williams] appeared to indicate that he did not wish to speak to an attorney and that he was willing to continue to speak to the officers about the offense. Under these circumstances, the trial court properly denied [Williams’s] motion to suppress the statement from December 14, 2005, because it does not appear that [Williams] actually invoked his right to counsel during questioning on November 30, 2005.
“Moreover, even if [Williams] had invoked his right to counsel on November 30, 2005, [Detective] Torrence testified that he questioned [Williams] on December 14, 2005, only after one of [Williams’s] family members told him [Williams] wanted to talk to him again. [Williams] did not dispute [Detective] Torrence’s testimony. Because it appears that [Williams] reinitiated contact with [Detective] Torrence, the trial court properly denied [Williams’s] motion to suppress the statement he made to [Detective] Torrence on December 14, 2005.”
Williams timely sought certiorari review of the Court of Criminal Appeals’ decision.
Discussion
The Court of Criminal Appeals affirmed the trial court’s denial of Williams’s motion to suppress his December 14, 2005, statement because, it held, Williams never clearly invoked his right to counsel during the November 30, 2005, interrogation. The Court of Criminal Appeals further held that even if Williams had invoked his right to counsel on November 30, 2005, the statements he made on December 14, 2005, should not be suppressed because the statements were made after Williams rein-itiated contact with the police through a third party.
Williams argues that the Court of Criminal Appeals erred in determining that his statements asserting his Fifth Amendment right to counsel were ambiguous. Williams also argues that because he properly asserted his right to counsel, the police violated Edwards v. Arizona, supra, when they reinitiated contact with him based on the request of a third party, even though he had previously declined to talk to the police without an attorney present.
*675 It is not necessary for this Court to determine whether Williams’s request for an attorney on November 30, 2005, was unequivocal. Even if we assume that Williams’s request was unequivocal, Williams’s argument that the police violated Edwards v. Arizona when they reiniti-ated contact with him is dispositive of this case.
Holding of Edwards v. Arizona
In Edwards v. Arizona, supra, the suspect, Edwards, was arrested on charges of robbery, burglary, and first-degree murder. The arresting officer read Edwards his Miranda rights. Edwards stated that he understood those rights and that he was willing to answer questions regarding the charges. Edwards told the police that he wanted to “make a deal” and later stated that he wanted to speak to an attorney before making a deal. The officer ceased questioning Edwards, and Edwards was taken to county jail. The next day, however, two police detectives (colleagues of the arresting officer) came to the jail and asked to speak with Edwards. Edwards refused to talk with the detectives, but the guard told him that he “had” to talk with them. The detectives informed Edwards of his Miranda rights, and Edwards agreed to talk to the detectives. He subsequently incriminated himself during the interrogation. Edwards’s confession was admitted at trial, and he was convicted on all the charges.
The Supreme Court in Edwards held:
“[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.”
451 U.S. at 484-85, 101 S.Ct. 1880 (footnote omitted). In support of its decision, the Supreme Court cited several cases issued both before and after Miranda that had established a rule to protect suspects in police custody from being “badgered” by police officers into waiving their previously asserted right to counsel.[2] “[This] Court has strongly indicated that additional safeguards are necessary when an accused asks for counsel .... ” 451 U.S. at *676 484, 101 S.Ct. 1880. “[I]t is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterro-gate an accused in custody if he has clearly asserted his right to counsel.” 451 U.S. at 485, 101 S.Ct. 1880.
The Supreme Court in Edwards made it clear that a suspect may waive his previously asserted right to counsel and respond to interrogation. However, when an accused has invoked his right to counsel, a valid waiver of that right cannot be established by showing only that the accused responded to police-initiated interrogation after again being advised of his Miranda rights. The Supreme Court held that, based on a totality of the circumstances, Edwards’s Fifth Amendment rights were violated and his confession due to be suppressed because Edwards had not been appointed counsel and the police had initiated contact with Edwards after he had requested counsel.
Supreme Court Jurisprudence pre- and posi-Edwards v. Arizona
Subsequent to Edwards, a plurality of the Court in Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), addressed what constituted, under Edwards, “initiation” by the accused of conversation with law enforcement. Questions by the accused regarding “the routine incidents of the custodial relationship,” for example, asking to use the bathroom or the telephone, are not valid initiations by the accused. 462 U.S. at 1045, 103 S.Ct. 2830. Instead, the accused must “evince[ ] a willingness and a desire for a generalized discussion about the investigation.” 462 U.S. at 1045-46, 103 S.Ct. 2830.
In Arizona v. Roberson, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), the Supreme Court addressed whether the Fifth Amendment bars police-initiated interrogation in a case following an accused’s request for counsel in an investigation of an unrelated case. Roberson was arrested on suspicion of burglary, and he requested counsel before answering questions. While he was still in custody on the burglary charge, different officers read Roberson his Miranda rights, interrogated him, and obtained incriminating statements about a second unrelated offense. The Supreme Court held that the presumption that a suspect believes he is unable to proceed without counsel “does not disappear simply because the police have approached the suspect, still in custody, still without counsel, about a separate investigation.” 486 U.S. at 683, 108 S.Ct. 2093. The Supreme Court rejected the contention that the police officer’s lack of knowledge as to Roberson’s previous invocation of his Miranda rights vitiated the protections afforded by the rule of Edwards:
“In addition to the fact that Edwards focuses on the state of mind of the suspect and not of the police, custodial interrogation must be conducted pursuant to established procedures, and those procedures in turn must enable an officer who proposes to initiate an interrogation to determine whether the suspect has previously requested counsel.... [Wjhether the same or different law enforcement authorities are involved in the second investigation, the same need to determine whether the suspect has requested counsel exists. The police department’s failure to honor that request cannot be justified by the lack of diligence of a particular officer.”
Roberson, 486 U.S. at 687-88, 108 S.Ct. 2093 (footnote omitted).
In North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), the Supreme Court quoted Miranda: “ ‘Without proper safeguards the process *677 of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual’s will to resist and to compel him to speak where he would not otherwise do so freely.” ’ 441 U.S. at 374, 99 S.Ct. 1755 (quoting Miranda, 384 U.S. at 467, 86 S.Ct. 1602). However, the Butler Court held that Miranda does not require an express waiver of the right to counsel. Butler had made a statement that he wanted to talk with police but that he would not sign anything. He then implicated himself. The Supreme Court held that Butler’s inculpatory statements made during his custodial interrogation without counsel were not inadmissible simply because of the absence of an express waiver of the right to counsel.
“An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver .... The courts must presume that a defendant did not waive his rights; the prosecution’s burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.”
441 U.S. at 373, 99 S.Ct. 1755.
In Smith v. Illinois, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), the Supreme Court stated that the rule in Edwards involves two independent inquiries:
“First, courts must determine whether the accused actually invoked his right to counsel.... Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on a finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.”
469 U.S. at 95, 105 S.Ct. 490. The Smith Court further stated: “In the absence of such a bright-line prohibition, the authorities through ‘badger[ing]’ or ‘overreaching’ — explicit or subtle, deliberate or unintentional — might otherwise wear down the accused or persuade him to incriminate himself notwithstanding his earlier request for counsel’s assistance.” 469 U.S. at 98, 105 S.Ct. 490. In Smith, the police read Smith his Miranda rights and asked if he understood his right to have counsel present during the interrogation. Smith responded, “Uh, yeah. I’d like to do that.” 469 U.S. at 93 105 S.Ct. 490. The police officer then finished reading Smith his rights and asked if Smith wanted to talk to the officer without a lawyer present, to which Smith answered, “Yeah and no, uh, I don’t know what’s what really.” Id. Smith then agreed to talk to the police; he ultimately confessed. After more questioning, Smith insisted that he wanted to speak to a lawyer, and the interrogation ceased. The Supreme Court held that Smith’s statements were inadmissible.
Later, in Minnick v. Mississippi, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), the Supreme Court addressed whether the rule in Edwards would require suppression of a confession when the police obtained the confession during an interrogation that occurred after the accused had requested counsel but without counsel present. Minnick had escaped from jail and murdered two people. He was eventually apprehended and then questioned by federal officers. The questioning ceased when Minnick requested counsel. However, after Minnick had conferred with counsel, the questioning resumed, without counsel present, and Min-nick confessed. Minnick challenged the admission of the incriminating statement he had made to police after speaking with his lawyer because, he argued, he had never waived his Miranda rights. The Supreme Court held that any confession given in response to police interrogation *678 outside the presence of counsel, once counsel has been requested, may not be admitted at trial unless the defendant himself had reinitiated the communication with police.
“Edwards is ‘designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights.’ Michigan v. Haney, 494 U.S. 344, 350 (1990). See also Smith v. Illinois, 469 U.S. 91, 98 (1984). The rule ensures that any statement made in subsequent interrogation is not the result of coercive pressures. Edwards conserves judicial resources which would otherwise be expended in making difficult determinations of voluntariness, and implements the protections of Miranda in practical and straightforward terms.
“The merit of the Edwards decision lies in the clarity of its command and the certainty of its application. We have confirmed that the Edwards rule provides ‘ “clear and unequivocal” guidelines to the law enforcement profession.’ Arizona v. Roberson, 486 U.S. 675, 682 (1988). Cf. Moran v. Burbine, 475 U.S. 412, 425-426 (1986). Even before Edwards, we noted that Miranda’s, ‘relatively rigid requirement that interrogation must cease upon the accused’s request for an attorney ... has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained during such interrogation are not admissible. This gain in specificity, which benefits the accused and the State alike, has been thought to outweigh the burdens that the decision in Miranda imposes on law enforcement agencies and the courts by requiring the suppression of trustworthy and highly probative evidence even though the confession might be voluntary under traditional Fifth Amendment analysis.’ Fare v. Michael C., 442 U.S. 707, 718 (1979). This pre-Edwards explanation applies as well to Edwards and its progeny. Arizona v. Roberson, supra, 486 U.S., at 681-682.”
498 U.S. at 150-51, 111 S.Ct. 486. The Supreme Court went on to state that it declined to remove an accused’s protection from police-initiated questioning based on the accused’s isolated consultations with counsel, who is absent when the interrogation resumes. To that end, the Supreme Court stated:
“The exception to Edwards here proposed is inconsistent with Edwards ’ purpose to protect the suspect’s right to have counsel present at custodial interrogation. It is inconsistent as well with Miranda, where we specifically rejected respondent’s theory that the opportunity to consult with one’s attorney would substantially counteract the compulsion created by custodial interrogation. We noted in Miranda that ‘[ejven preliminary advice given to the accused by his own attorney can be swiftly overcome by the secret interrogation process. Thus the need for counsel to protect the Fifth Amendment privilege comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires.’ 384 U.S., at 470 (citation omitted).
“The exception proposed, furthermore, would undermine the advantages flowing from Edwards’ ‘clear and unequivocal’ character. Respondent concedes that even after consultation with counsel, a second request for counsel should reinstate the Edwards protection. We are invited by this formulation to adopt a regime in which Edivards’ protection could pass in and out of existence multiple times prior to arraignment, at which point the same protection might reattach by virtue of our Sixth Amend *679 ment jurisprudence, see Michigan v. Jackson, 475 U.S. 625 (1986). Vagaries of this sort spread confusion through the justice system and lead to a consequent loss of respect for the underlying constitutional principle.
“In addition, adopting the rule proposed would leave far from certain the sort of consultation required to displace Edwards. Consultation is not a precise concept, for it may encompass variations from a telephone call to say that the attorney is en route, to a hurried interchange between the attorney and client in a detention facility corridor, to a lengthy in-person conference in which the attorney gives full and adequate advice respecting all matters that might be covered in further interrogations. And even with the necessary scope of consultation settled, the officials in charge of the case would have to confirm the occurrence and, possibly, the extent of consultation to determine whether further interrogation is permissible. The necessary inquiries could interfere with the attorney-client privilege.
“Added to these difficulties in definition and application of the proposed rule is our concern over its consequence that the suspect whose counsel is prompt would lose the protection of Edwards, while the one whose counsel is dilatory would not. There is more than irony to this result. There is a strong possibility that it would distort the proper conception of the attorney’s duty to the client and set us on a course at odds with what ought to be effective representation.
“Both waiver of rights and admission of guilt are consistent with the affirmation of individual responsibility that is a principle of the criminal justice system. It does not detract from this principle, however, to insist that neither admissions nor waivers are effective unless there are both particular and systemic assurances that the coercive pressures of custody were not the inducing cause. The Edwards rule sets forth a specific standard to fulfill these purposes, and we have declined to confine it in other instances. See Arizona v. Roberson, 486 U.S. 675 (1988). It would detract from the efficacy of the rule to remove its protections based on consultation with counsel.”
498 U.S. at 154-56, 111 S.Ct. 486.
In Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the Supreme Court concluded that the rule in Edwards does not apply when a suspect fails to unambiguously ask for a lawyer. The Edwards rule “ ‘is designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights.’ ” 512 U.S. at 458, 114 S.Ct. 2350 (quoting Michigan v. Harvey, 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990)). The Davis Court stated:
“To recapitulate: We held in Miranda that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. We held in Edivards that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present. But we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect might want a lawyer. Unless the suspect actually requests an attorney, questioning may continue.”
512 U.S. at 462, 114 S.Ct. 2350.

Jurisprudence from Other Jurisdictions Addressing Effect of a Third Party’s Initiation, on Behalf of an Accused, of Further Communication with the Police After the Accused Has Invoked His Fifth Amendment Right to Have Counsel Present During Interrogation

Although the Supreme Court has not addressed whether a third party, on behalf *680 of the accused, may initiate communication with the police after the accused has requested counsel, other courts have. See, e.g., Van Hook v. Anderson, 488 F.3d 411 (6th Cir.2007)(holding that a suspect who has invoked his right to counsel can indirectly initiate discussions with the police through a third party so long as the impetus for the reinitiation comes from the suspect); Owens v. Bowersox, 290 F.3d 960 (8th Cir.2002)(holding that, although defendant had requested counsel, defendant initiated contact with the police because the impetus for interrogation came from defendant through his mother even though defendant did not contact the police himself and did not ask his mother to have police come to the jail); United States v. Michaud, 268 F.3d 728 (9th Cir.2001)(holding that police had the right to ask if the accused was reinitiating communication after requesting counsel where the accused’s cell-mate told a deputy the accused wanted to talk); Whitehead v. Cowan, 263 F.3d 708 (7th Cir.2001)(incriminating statements made by defendant after he was persuaded to talk to police by an acquaintance who had visited defendant in jail after defendant had requested counsel were the not functional equivalent of a police interrogation); Holman v. Kemna, 212 F.3d 413 (8th Cir.2000)(holding that defendant initiated contact with the police by asking his stepfather to have a deputy come to the prison to take his confession); United, States v. Gonzalez, 183 F.3d 1315 (11th Cir.1999), overruled on other grounds, United States v. Farese, 248 F.3d 1056 (11th Cir.2001)(holding that defendant initiated contact with the police through his wife following his invocation of his right to counsel); United States v. Rodriguez, 993 F.2d 1170 (5th Cir.1993)(holding that statements were inadmissible when FBI agent reinterrogated defendant after he requested counsel based on codefendant’s vague statement that the other defendants wanted to talk with the police); United States v. Gaddy, 894 F.2d 1307 (11th Cir.1990)(holding that the accused initiated contact with the police through an aunt); and Harwell v. State, 275 Ga. 129, 562 S.E.2d 180 (2002)(holding that police did not improperly reinitiate questioning of defendant where defendant’s mother told the police that her son was willing to make a statement and defendant verified that he was).
One case in particular warrants a detailed discussion. In Van Hook v. Anderson, supra, Van Hook went to a bar in Ohio patronized by homosexual men. He met the victim, David Self, at the bar, and the two went to Selfs apartment. Self made sexual advances to Van Hook, and Van Hook strangled Self to unconsciousness. Van Hook then stabbed Self and killed him. Van Hook also stole items from Selfs apartment. Van Hook made his way to Florida, where he was arrested two months later by local police. The police read him his Miranda rights. Although he initially agreed to talk with police, Van Hook later told police, “[M]aybe I should have an attorney present.” 488 F.3d at 414. The officers understood this to be a request for counsel and ceased questioning him about Selfs murder. Later that day, an Ohio police officer, came to Florida to facilitate Van Hook’s extradition and transportation back to Ohio. Van Hook had not yet been provided with counsel. After talking with Van Hook’s mother, the Ohio officer believed that Van Hook might want to talk to police about the murder.
At this point, counsel had not yet been appointed for Van Hook. Upon first engaging Van Hook, the officer discussed extradition with Van Hook and confirmed that Van Hook "wanted to waive extradition. The officer told Van Hook that he had talked to Van Hook’s mother and that she *681 had said that Van Hook wanted to speak with the police. Van Hook stated that he had talked to his mother and that she wanted him to tell the truth and that he wanted to make a statement. Van Hook was again read his Miranda rights, and he waived them, giving a full and graphic confession. Van Hook was charged with murder and aggravated i'obbery. The Ohio trial court admitted his confession, and Van Hook was convicted. On appeal, the Ohio Supreme Court affirmed his conviction, and the United States Supreme Court denied certiorari review. Van Hook filed a petition for a writ of habeas corpus in the federal district court and was unsuccessful. A panel of the United States Coui’t of Appeals for the Sixth Circuit reversed the district court’s decision, holding that the Fifth Amendment does not allow a suspect to initiate communications with the police through a third party. On rehearing en banc, the United States Court of Appeals for the Sixth Circuit vacated the panel’s holding and in an 8-7 decision affirmed the district court’s decision.
The eight-member majority opinion in Van Hook ultimately held that a suspect may initiate further discussions with the police through a third party without violating Edwards.
“Given the realities of the custodial relationship, it is inevitable that the police will sometimes receive information from a suspect or a third party which might evince a willingness and a desire to talk by the suspect.... In this type of situation, the police may ‘inquire whether [the suspect] was re-initiating communication.’ [United States v.] Michaud, 268 F.3d [728] 735-36 [ (9th Cir.2001) ].”
488 F.3d at 428.
Van Hook had argued that under Edwards the accused “himself’ must initiate discussions with the police. Van Hook, 488 F.3d at 417. The majority rejected Van Hook’s argument, stating that “[t]here is no sound justification for reading the statement from Edwards that the suspect ‘himself must initiate a discussion to imply the suspect, and only the suspect, can inform the police he wants to talk.” Id. The majority reasoned that the issue of third-party communications was simply not before the United States Supreme Court in Edi.uards.
The majority in Van Hook, in determining how the Edwards rule applied to third-party communications with the police regarding an accused’s desire to initiate contact, addressed the standard for determining when an accused “initiates” discussion with the police. Quoting United States v. Whaley, 13 F.3d 963, 967 (6th Cir.1994), the court stated: “ ‘[A]n Edwards initiation occurs when, without influence by the authorities, the suspect shows a willingness and a desire to talk generally about his case.’ ” The Van Hook court determined that there is “nothing inherent in ‘showfing] a willingness and a desire’ that restricts it to direct communications only.” 488 F.3d at 418. “Whether the communication is direct or indirect is immaterial — what is important is the impetus for discussion come from the suspect himself.” Id.
The majority in Van Hook acknowledged the protections afforded by Miranda and Edivards and that the purpose behind those cases was to prevent “ ‘government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment.’ ” 488 F.3d at 420 (quoting Arizona v. Mauro, 481 U.S. 520, 529-30, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987)). The Van Hook court stated: “The Constitution clearly forbids officials from using their ‘power of the sword’ to coerce a suspect into making self-incrimi *682 nating statements; it provides no similar protection against third-party cajoling, pleading, or threatening.” 488 F.3d at 421.
“With third-party communications, the police are still prohibited from reinitiat-ing questioning, and the impetus for reinitiation must still come from the suspect. The virtue of specifically identifying rights and duties is preserved: ‘police and prosecutors’ still know ‘what they may do in conducting custodial interrogation’ under Edwards — interrogate a suspect unless and until the suspect asks for a lawyer, and then not interrogate the suspect unless the suspect initiates a discussion (and waives the right to counsel); and ‘courts’ still know ‘under what circumstances statements obtained during such interrogation are not admissible’ — when the discussions are initiated by police. These players must simply bear in mind what is grasped by common sense and what has been the consistent rule of the post-Edwards case law — initiation can be communicated directly by the suspect or indirectly by the suspect through a third party.”
488 F.3d at 422.
Recognizing that whether a suspect has reinitiated a discussion with police can be a difficult question, the Van Hook court explained its evaluation of a third party’s reinitiation of discussion on the suspect’s behalf:
“While a suspect’s initiation might lead to a valid waiver of the right to counsel, it is not itself sufficient. Before the police can actually begin to interrogate a suspect after he has initiated, they must ensure that the suspect is knowingly and intelligently waiving the right to counsel under the totality of the circumstances.... It is ‘wrong to ‘think [ ] that an “initiation” of a conversation or discussion by an accused not only satisfied the Edwards rule, but ex pro-prio vigore sufficed to show a waiver of the previously asserted right to counsel. The inquiries are separate, and clarity of application is not gained by melding them together.’ [Oregon v.] Bradshaw, 462 U.S. [1039] 1045, 103 S.Ct. 2830 [ (1983) ] (plurality). Simply put, nothing in our decision today permits the police to begin interrogating a criminal suspect simply by learning from a third party that the suspect is willing to waive the previously invoked right to counsel. Nor do we hold that a third party has the authority to somehow ‘bring[ ] about the waiver of that right,’ ... or otherwise ‘rescind[ ] th[e] request’ for counsel .... When the police receive information that a suspect wants to talk; when there is a sufficient basis for believing its validity; and when the police confirm with the suspect the validity of that information, we conclude that the suspect has adequately evinced a willingness and a desire to talk with them. Whether the suspect knowingly and intelligently waives his right to counsel is a separate question .... ”
488 F.3d at 424-25. The Van Hook court held that the facts supported a conclusion that Van Hook did initiate a discussion with the police and that the trial court was correct in denying habeas relief on the claim that Van Hook’s statement should have been suppressed. “The Constitution protects a suspect from official coercion— it does not protect a suspect from himself or his mother.” 488 F.3d at 428.
In his dissent in Van Hook, Judge Cole wrote that the majority had departed from the Supreme Court’s jurisprudence on custodial interrogation. “[T]he coercive setting of custodial interrogation is ready-made for the infringement, whether intentional or inadvertent, of constitutional pro *683 tections, such that suspects must be plainly advised of their rights so they may act on them.” 488 F.3d at 430. In particular, he noted that throughout the Supreme Court’s jurisprudence the Court has insisted that the “relationship between a criminal suspect and his official interrogator be governed by ‘bright-line’ rules that precisely spell out the rights and duties of both parties.” 488 F.3d at 430.
“To hold as the majority does today, that a suspect may re-initiate interrogation through a third party, contravenes the reasoning of the Supreme Court’s custodial-interrogation jurisprudence by inviting the very uncertainty and complexity into the circumstances surrounding a suspect’s waiver of his rights that the Court has sought to banish. This uncertainty and complexity ensnares both the suspect and the law-enforcement officers in charge of his case.”
488 F.3d at 432.
Judge Cole questioned why a suspect would communicate indirectly with the police through a third party when the suspect could do so directly. He also set out several examples of the problems with third-party communications, including the possibility that the third party misinterpreted the suspect’s words or that a third party may be colored by his or her own view of what is in the suspect’s best interest. Judge Cole also noted an asymmetry in the majority opinion: a suspect cannot invoke his right to counsel through a third party, although the third party may “nonetheless play a role in bringing about the waiver of that right.” 488 F.3d at 435. Judge Cole also disagreed with the majority’s holding that the facts supported the proposition that Van Hook initiated eom-munication with the police through his mother.
Although Judge Cole’s dissent raises valid points, we agree with the majority opinion in Van Hook that under Edwards an accused can initiate further interrogation through a third party. We recognize that Edwards and the Supreme Court decisions both pre- and post-Edwards established a bright-line rule preventing police from reinitiating contact with an accused; however, those cases also recognized that an accused can later decide to reinitiate communication. Edwards was not concerned with the channels or means of communication, but with whether the accused himself reinitiated interrogation. With third-party communications, the police are still prohibited from reinitiating questioning, and the impetus for reinitiation must still come from the accused.

Conclusion

Assuming that Williams’s request for counsel on November 30, 2005, was unequivocal, we disagree with Williams’s argument that the police violated Edwards when they reinitiated contact with him on December 14, 2005. Accordingly, the judgment of the Court of Criminal Appeals is affirmed.
AFFIRMED.
WOODALL, STUART, SMITH, and PARKER, JJ., concur.
BOLIN, J., concurs specially.
COBB, C.J., and LYONS, J., concur in the result.
MURDOCK, J., dissents.
SHAW, J., recuses himself.*

. Williams’s interview was videotaped, and it is not clear what words Williams used regarding a lawyer at that point in the interrogation. A transcript was made of the police interview, but it was not offered into evidence, and it appears from the record that the transcript refers to Williams's request as being ‘'inaudible.”

. The Supreme Court cited the following cases: Massiah v. United States, 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) (holding that a defendant is "denied the basic protections of [the Sixth Amendment] when there [is] used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel”); Michigan v. Mosley, 423 U.S. 96, 104 n. 10, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975)(holding that the procedural safeguards triggered by a request to remain silent and a request for an attorney are distinguishable); Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)(holding that a waiver of the Sixth Amendment right to counsel could not be inferred from the mere response by the accused to overt or more subtle forms of interrogation or other efforts to elicit incriminating information); Rhode Island v. Innis, 446 U.S. 291, 298, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (holding that a suspect has an "undisputed right” under Miranda to remain silent and be free of interrogation "until he has consulted with a lawyer”); and Fare v. Michael C., 442 U.S. 707, 719, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) (referring to Miranda's “rigid rule that an accused's request for an attorney is per se an invocation of his Fifth Amendment rights, requiring that all interrogation cease”).